PAN–AMERICAN CASUALTY COM-
PANY, Appellant,

v.

Edwin L. REED, Jr., and Mary Ann
Bernard Reed, Appellees.

No. 16232.

United States Court of Appeals
Fifth Circuit.

Jan. 16, 1957.

Rehearing Denied Feb. 13, 1957.

Guy E. Humphries, Jr., Gravel, Humphries, Sheffield & Mansour, Alexandria, La., for appellant.

James G. Dubuisson, Felix A. DeJean, Jr., Dubuisson & Dubuisson, Opelousas, La., for plaintiffs-appellees.

Before BORAH, TUTTLE and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from a judgment on a jury verdict against defendant insurance company sued under the Louisiana Direct Action Statute LSA–R.S. 22:655 by plaintiff passengers, husband and wife, for injuries suffered by them and for the death of their prematurely born child, in an accident caused by the negligence of the driver of the car, defendant's assured, the mother and mother-in-law of the plaintiffs. The three questions at issue here are: (1) whether plaintiffs sustained the burden of proof that the infant's death was proximately due to the accident; (2) whether it was prejudicial error to permit the examination of defendant's assured by plaintiffs under cross-examination; (3) whether the failure to disclose the name of one of plaintiffs' witnesses during the pre-trial proceedings is such a violation of Rule 16 that a new trial should be ordered.

On June 25, 1953, plaintiff, Mrs. Reed, then seven and one-half months pregnant, started feeling pains and bleeding.

A doctor, Dr. DeBlanc, was called, and later testified that he had diagnosed merely "false labor." He left but was later advised by phone that Mrs. Reed was again having pains and he advised a hospital check-up. Mrs. Reed's mother, Mrs. Bernard, defendant's assured, drove her daughter and son-in-law toward the hospital. Outside of Church Point, Louisiana, a cow wandered onto the road in front of the car. Mrs. Bernard lost control and the car ran into a ditch and turned on its side. Mrs. Reed was badly shaken up.

Help came and Mrs. Reed was taken to the hospital where a little time later she was delivered of her second child, who, although apparently healthy at birth, died 46 hours later of atelectasis, or failure of the lungs to expand properly.

The medical testimony was offered by several doctors. Dr. DeBlanc was of the opinion that Mrs. Reed was not in labor when he examined her but he advised her later to go to the hospital when pains were noticed. He did not see her thereafter as he was not her regular obstetrician. Dr. Bellard, Mrs. Reed's obstetrician, was away when the birth occurred, but he attended her and examined her within an hour after the delivery. He saw no evidence of injury to her or the baby. They both appeared normal. Thereafter, some two or three hours later, the baby had respiratory trouble and it was placed in a compression chamber where it stayed under treatment until it died of atelectasis. He said he could find nothing that showed the delivery was caused by an accident. He further stated: "In my opinion and experience I do not think the accident had any bearing on the delivery * * *" and also: "I do not believe there was any connection between the accident and the delivery of the child or the death of the child." [1] He also testified that the most frequent

---

[1] On cross-examination he testified that a jolting of the kind Mrs. Reed received frequently causes a premature delivery; also that a severe jolting accident to the mother *could* produce separation of the placenta; that such separation would bring on bleeding, and if the accident here was followed by excessive bleeding this *could* be indicative of the fact that the placenta may have been separated."

cause of deaths of both premature and full-time babies is atelectasis, and that more premature babies die from this cause than from all others.

Dr. Sinclair testified by deposition that he had performed an autopsy on the infant and had concluded that death was due to failure of the lungs to expand completely due to some cause which was not obvious at the time of the autopsy or on subsequent examination of the tissue sections. He found nothing to indicate that trauma had caused the condition.

Dr. Robertson, who testified only as an expert witness in response to hypothetical questions, stated that it was *possible* that the kind of accident that here occurred would cause a premature birth. He was not asked for, and therefore did not give, an opinion whether, assuming all of the facts might properly be accepted by the jury, this particular accident caused the premature birth.

Dr. Mayer, also testifying in response to hypothetical questions, said that in his opinion in the circumstances related in the questions,[2] the accident "precipitated labor" and caused the birth of the child.

Dr. C. L. Keller, the obstetrician who was called to attend Mrs. Reed when it was impossible to reach her own doctor, testified to the fact that the birth was normal except for the fact it was premature; the baby cried naturally immediately after birth; that he examined the placenta and there was no indication of damage to it and there was no indication of excessive bleeding prior to the birth. He testified that there was no evidence at the time he examined Mrs. Reed, either before or during the delivery, that would indicate that an accident was involved or related to the birth of the child and that there was nothing about the child that indicated that the child had been injured in the accident or that its birth was caused by

2. The series of questions and the responses to them follows:

"Q. Now, Doctor, assuming that a woman has gone seven and a half months pregnant, and that some sort of trauma, or jerk, happens to her, such as getting into an automobile accident, wouldn't that be capable of bringing on premature birth?

"A. That is certainly possible, yes.

"Q. As a matter of fact, it does occur, does it not?

"A. It does.

"Q. Would you say that, assuming the length of pregnancy—would you say that the woman who was riding in an automobile on a gravel road in the country at a rate of speed of something around thirty-five to forty miles an hour, in which the driver of the automobile suddenly lost control of the car, and it went swerving down the road a distance of some one hundred and fifty feet thereafter, landing in a ditch with the automobile turned over on the right side—would you say that such an accident or occurrence could cause the premature birth of her baby?

"A. Definitely I think that trauma could and does sometimes start a woman into premature labor.

"Q. When you say 'labor' what does that mean?

"A. I mean labor preceding the birth of a child.

"Q. Going further, Doctor, with that assumption, suppose that that woman soon after the accident gave birth to a child, and further assuming that previous to the accident, say around two hours before the baby's birth, possibly a shorter time, possibly a longer time—that you had examined her and found that she was just spotting, and that you made a pelvic examination and found that there was no dilation whatever, but that shortly thereafter she began to have pains which were not regular but sporadic, and not severe, and assuming that she then got into that automobile and got into that wreck, and immediately after the wreck she began to flooding, and that shortly before getting to the hospital she began to have severe and regular pains, and was flooding, what then would you say was the effect of that accident on the woman and the cause of the birth of that child, premature birth?

"A. Well, it certainly sounds to me like, as you stated before this accident the woman was not in pain, had the accident which precipitated labor, and later on gave birth to the child. I don't know that to be a fact, but that is my opinion."

the accident. He said: "The birth of the child was an absolutely normal delivery." On cross-examination he said it was *possible* that the accident *could* have caused this premature birth.

Dr. Prather, who was called in as a pediatrician to help with the treatment of the infant when it became apparent that it was in dangerous condition, diagnosed the condition as congenital atelectasis. He said a premature baby was more susceptible to the condition than a full-time baby. He then stated that "many of those babies who are born prematurely and die of atelectasis would not have died of atelectasis if they had been able to reach full time maturity."

Upon this medical testimony, which we have given rather fully, we are asked to hold that there was not sufficient evidence with all inferences that could be reasonably drawn from it, to warrant submission of the issue of causation to the jury.

We think this is so only if it appears from the record that the jury could not find on the evidence before it that labor had not commenced before the accident, for if the jury could have found that labor had not commenced before the accident, then there was sufficient evidence to warrant the necessary inferences of causation of the premature delivery and of the adverse effect of premature delivery on the incidence of atelectasis.

The unanimous medical testimony was to the effect that in every case of a birth there must be a period of labor, whether or not accompanied by labor pains. This was variously testified to by Dr. Robertson who said he had once seen an instance of labor of an hour and one of "less than an hour," [3] and that it took an average of six hours for a second baby at another place in his testimony; by Dr. Mayer who said that normal labor time was 12 to 14 hours, but that

trauma might cause the shortening of the time to "a matter of" from one to two hours; by Dr. Keller, the doctor who delivered the baby, who said he had never known of labor of less than "about" two hours.

As is apparent from what we have said the issue narrows down to a point which is too fine for us to hold that the trial judge erred in submitting the case to a jury. There is evidence that trauma occurred; there is evidence that trauma frequently induces premature labor, and that under circumstances which the jury could find existed it did do so; that trauma causes "precipitant labor" and that the duration of labor in such cases may be from less than an hour to much longer periods. Further there is proof that after the accident there was a delay of fifteen minutes, followed by a trip of five miles in another automobile to the hospital.[4] Mrs. Reed then checked in at the hospital and time was consumed in an effort to reach Dr. Bellard. Dr. Mayer was then reached and he came to the hospital and about fifteen minutes later the baby was born. Absent a positive and unequivocal showing that labor must continue for a stated definite and certain period (and there was not such showing), there was no burden on plaintiff to show that the details above related consumed at least that period of time. They certainly consumed more than a half hour and may have taken over an hour, which would meet the minimum test set down by the testimony of two doctors.

There is no dispute over the principles that govern the submission of such an issue to a jury. It is incumbent on one seeking a recovery to present probative facts from which, standing alone or forming the basis of expert testimony, the causal relation can reasonably be inferred. Fort Worth & Denver City Ry. Co. v. Smith, 5 Cir., 206

---

3. From his subsequent testimony it is apparent that he may have been talking of labor pains rather than labor itself, the

process through which the organs go to permit the delivery of the baby.

4. No one even estimated the speed of the car or the time consumed.

F.2d 667.[5] The essential requirement is that mere speculation be not allowed to do duty for probative facts after making due allowance for all reasonably possible inferences favoring the party whose case is attacked. Galloway v. United States, 319 U.S. 372, 395, 63 S.Ct. 1077, 87 L. Ed. 1458.

The difficulty arises in the application of the rule to the facts of the particular case. It is apparent here that the obstetricians who actually delivered Mrs. Reed's baby and later attended her thought the delivery was normal for a seven and a half months' pregnancy but they did not rule out the possibility of an induced labor, brought about by the trauma of the accident. It is also apparent from expert medical testimony that such trauma followed by heavy pains and profuse bleeding, testified to by Mrs. Reed, continuing over a period of as much as an hour, might well bring about the premature birth. One physician testified that in his opinion it would do so. This was sufficient to take the case to the jury if the issue of the cause of premature birth is the end of our inquiry. See Smith v. Forth Worth & Denver City Ry., supra. There is still the question, however, whether having found that the automobile accident caused the early birth the jury could infer that the death from atelectasis was traceable to the accident. While no case has been cited by appellee to support this proposition we hold that if the right of the infant to the start in life that results from nature's scheme of granting a nine months' period of gestation is shown to have been violently interfered with by the negligent act of another, and it is shown, as it has been here that such interference substantially increased the chances of death from the defect that actually caused death, then the jury may attribute the fact of death to the negligent act that caused the premature birth.

We now come to the allegation of error relating to the court's permitting Mrs. Bernard, the assured, to be called by the plaintiff as an adverse party and to be questioned as under cross-examination. It will be remembered that she was the mother of Mrs. Reed and the grandmother of the deceased child. Clearly, therefore, she could not be classed as a "hostile party" under Rule 43(b), F.R.C.P.[6] The trial court ruled that by the authority of our recent case of Maryland Casualty Co. v. Kador, 5 Cir., 225 F.2d 120, the assured of a liability insurance carrier is an adverse party even though not named as a defendant in the suit. This undoubtedly was the holding of the Kador case. Appellant argues that that ruling should be limited to the facts in that case where the assured appeared to cooperate fully with the defense and it was not shown that there was a natural sympathy of the assured with the cause of the plaintiff, as is so obviously the case here. We do not find it necessary to determine whether such limitation should be placed on the ruling of that case, (though there is certainly much in the basic principles relating to examination of friendly and hostile witnesses to argue for such a limitation) because we are convinced that no prejudicial harm resulted to appellant from the ruling complained of. A careful reading of the questions and answers propounded to and elicited from Mrs. Bernard quickly demonstrates that none of the techniques of cross-examination were needed or much used to elicit the relatively thin case of her own negligence made out by her. In view of the wide latitude given the trial court in the method of examining of witnesses generally, and noting the harmlessness of the procedure here, we hold that no reversible error occurred from the court's ruling in this respect.

So, too, do we fail to find any reversible error in the court's permitting

---

5. Cf. subsequent appearance of the same case, Smith v. Ft. Worth & Denver City Rwy. Co., 5 Cir., 219 F.2d 43.

6. Fed.Rules Civ.Proc. rule 43(b), 28 U.S. C.A.

Dr. DeBlanc to testify though he was not mentioned as a witness at the pretrial hearing a few days before trial. Counsel for appellant did not move for a continuance or in any way call to the court's attention any objection to Dr. DeBlanc's testifying in order to permit the court to prevent any injustice that might result from the failure to disclose the fact that he would testify. We cannot note on appeal and alleged error of this sort when it is apparent that counsel decided to chance the case with the jury rather than ask for a continuance and raised his objection for the first time on motion for judgment n. o. v.

Finding no reversible error, we affirm the judgment of the trial court.

Judgment Affirmed.