Mrs. Edith Adams DEGELOS, individually, and as natural tutrix of her minor daughter, Carolyn Jeanne Degelos, Appellant,

v.

The FIDELITY AND CASUALTY COMPANY OF NEW YORK and United Services Automobile Association, Appellees.

No. 19899.

United States Court of Appeals
Fifth Circuit.

Feb. 6, 1963.

Rehearing Denied March 13, 1963.

Murray F. Cleveland, New Orleans, La., Edwards & Edwards, Nolan J. Edwards, Crowley, La., Henican, James & Cleveland, New Orleans, La., for appellant.

Fred H. Sievert, Jr., and Plauche & Stockwell, Lake Charles, La., for Fidelity & Casualty Co. of New York.

Donald Labbe and Voorhies, Labbe, Voorhies, Fontenot & Leonard, Lafayette, La., for United Services Automobile Ass'n.

Before HUTCHESON, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

■ This case presents the question whether in a suit nominally against a liability insurer under the Louisiana Direct Action Statute,[1] the plaintiff may call the assured as an adverse witness under F.R.Civ.P. 43(b).[2] As we did in Maryland Casualty Co. v. Kador, 5 Cir., 1955, 225 F.2d 120, we hold that the assured is, and may be called as, an adverse party. Pan American Casualty Co. v. Reed, 5 Cir., 1957, 240 F.2d 336, was not, as apparently supposed, a retreat. By our present decision, we hold fast. The District Court's categorical refusal to allow the Plaintiff to call the assured was therefore error. That error was substantial and prejudicial and not a harmless one. F.R.Civ.P. 61; 28 U.S.C.A. § 2111. We reverse.

For the reasons we later and briefly discuss, it is clear that, induced as he undoubtedly was by our own words, the District Judge nevertheless erred in his ruling. The important question then is whether the error was harmful. A brief discussion of the record reveals both how the matter arose and how critical was the need for the unlimited cross examination accorded by F.R.Civ.P. 43(b).

The plaintiff was Mrs. Degelos for herself and a minor daughter. The suit was to recover for damages sustained from injuries to and death of Adolph Degelos (husband and father). He was a passenger in a small foreign Vauxhall owned by a corporation in which he was a substantial stockholder. The Vauxhall was being driven by his son, Lyle Degelos, an officer of the corporation. The company-owned Vauxhall was insured by Fidelity.[3] It is undisputed that Lyle had the standing of an assured under that policy. In addition he had an individual automobile policy affording some coverage with United Services.[4] The suit, following the Louisiana Direct Action Statute pattern, was therefore brought against Fidelity and United Services. Lyle Degelos was not made a party since this would have destroyed diversity. However, the suit in direct and elaborately precise allegations asserted negligence of Lyle. Recovery depended altogether on the conduct of Lyle as driver of the Vauxhall.[5]

The question of whether Mrs. Degelos could call the son Lyle as an adverse witness was the subject of pre-trial consideration by the Court. The record reflects that at the outset of the trial, but before evidence commenced, the Court reaffirmed its earlier ruling that it would " * * * not permit [the plaintiff] to call Lyle H. Degelos, the son of the decedent, who was the driver of the insured vehicle." This action was taken because the Judge's " * * * interpretation of" our opinion in Pan American Casualty Co. v. Reed, supra, " * * * suggests that the better course would not be to permit the driver insured to be called when there is a family relationship between that insured and the plaintiff."

The Court made clear that if Lyle were called by the Plaintiff, he would be Plaintiff's witness. Counsel, respectable and responsible as they are, had no alternative but to conform their conduct throughout the trial to that ruling.

The occurrence of this nighttime accident requires only a brief summary.

1. La.Stat.Ann.—Rev.Stat. Title 22, § 655.

2. "(b) Scope of Examination and Cross-Examination. A party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of his examination in chief."

3. The Fidelity and Casualty Company of New York.

4. United Services Automobile Association.

5. Contributory negligence of the father was pleaded and submitted to the jury. But in the absence of a finding of Lyle's negligence, this was immaterial.

The Degelos Vauxhall was westbound on U. S. Highway 90 near Crowley, Louisiana. The other car, driven by Myers,[6] was proceeding easterly on Louisiana Highway 1111, a secondary tar-topped road. Westbound, Highway 90 makes a broad sweeping turn to the left. Highway 1111 comes into 90 to form a very slight Y. One driving west on 90 continuing in a straight direction would go onto 1111. Similarly, at various relative times and distances, headlights of two cars coming from opposite directions on 1111 and 90 would appear to be substantially approaching each other dead ahead on a single highway. The collision occurred at this intersection with the Degelos Vauxhall in its own righthand (north) lane on 90 at the moment of impact. A state Stop Sign was posted on 1111 some distance from the actual point of intersection. The state of Lyle's knowledge as to the existence of this Stop Sign became a disputed question in his own testimony. His testimony revealed, however, that when the Vauxhall was approximately 500 feet from the intersection, he saw the oncoming headlights of what turned out to be the Myers' car. Lyle also fixed its position at about 500 feet from that intersection. Though there were no obstructions whatsoever to vision, he testified that he did not thereafter observe the approaching lights (or the action of the oncoming car) until in the very jaws of collision, his father shouted out a warning just before the crash.

It takes no celebrated expert in tort litigation armed with visual aids or demonstrative evidence to sense that the case turned on what Lyle did in those fleeting feet and seconds, what he saw, what he did not see, what he looked for, what he ignored, and, perhaps most significant, what he then thought (or did not think) the oncoming car was, or was likely, going to do. The truth, therefore, lay in Lyle's memory, colored or affected or distorted or concealed as might it be from the myriad motives and impulses, sympathies or hostilities, helpful or self-protective, conscious or unconscious, engendered by judicial exploration of this awful incident.

The process of truth-telling as is the process of truth-ascertainment is seldom the simple question whether there has been conscious, wilful falsity. Nor is it even the simpler one of resolving the matter in terms of likely hostility *against* or friendliness *for* one party or the other. Thus, for every factor here tending Lyle toward the Plaintiff, there was one tugging in the opposite direction. Not the least of the latter was the suggestion hammered home by defense counsel that a finding of negligence was equivalent to a finding that Lyle had killed his father.

 Just what Lyle's real interests might be was not a matter for the District Judge, nor for us in the way of binding ex post facto parenthetical observations made from our more remote position.[7] That was for the jury to appraise in the light of a full and searching revelation. Our system of justice rests necessarily on the historic assumption that civilized moral people try their dead level best to tell the truth no matter how much it hurts or helps. But being a mechanism for the resolution of man's disputes, the instrument of cross exam-

6. This claim had previously been compromised.

7. In summarizing the argument pro and con for limiting the Kador principle, we made these comments in Pan American Casualty Co. v. Reed, supra, 240 F.2d 336 at 340.

"Appellant argues that that ruling should be limited to the facts in that case where the assured appeared to cooperate fully with the defense and it was not shown that there was a natural sympathy of the assured with the cause of the plaintiff, as is so obviously the case here. We do not find it necessary to determine whether such limitation should be placed on the ruling of that case, (though there is certainly much in the basic principles relating to examination of friendly and hostile witnesses to argue for such a limitation) because we are convinced that no prejudicial harm resulted to appellant from the ruling complained of."

ination is an integral part of that system in order to penetrate all of the conflicting impulses or obstacles to lay bare the whole truth. And yet from the nature of the strict procedural limitation imposed by the Judge, this could not be effectively done.

■ Real cross examination was entirely missing. The Plaintiff's counsel was forbidden by the Court's ruling to engage either in it, or in the indigenous but powerful tool of leading questions. The Defendants, while having the nominal right to cross examine, did not for perfectly obvious reasons do so in fact. By this procedural ruling the defense was put in the fortunate position of being able to argue that the witness (Lyle) —*for whose truthfulness and reliability the Plaintiffs generally vouched*—by his court-testimony and a written statement given to an insurance adjuster, had made contradictory statements on his knowledge of the existence of the Stop Sign. This physical-mental fact was at the very heart of the reasonableness of his conduct in thinking (or in not thinking) *that the oncoming car would or would not stop*. And as to this issue, the jury may have taken the easy way out—the Plaintiff's failure to satisfy a preponderance of the evidence—simply because it could not ascertain for sure just when Lyle had stated the truth.

■ This was not, therefore, the case of admission or exclusion of some bit of testimony asserted on appellate review to have been erroneous. This was the denial of the use of a tool of advocacy which our long judicial heritage marks as one of the most effective in the quest of truth. This was a substantial right. The experience of the bar is that it has substantial value. Indeed, the District Court recognized that by the very ruling under attack. Were it not effective, did he not think it would give the Plaintiff a substantial benefit (to which he thought the Plaintiff was not legally entitled) there is no reason for the Judge to have made the pretrial decision and order. As it was the denial of an important weapon in the arsenal of advocacy, the concept of

F.R.Civ.P. 61 does not require that the record developed without its assistance affirmatively pinpoint the harm in so many words. It is sufficient if we can see, as we readily do here, that the development of this record and the development of the testimony of Lyle as a witness might well have been quite different had the Plaintiff been accorded the right to put Lyle through all of the rigors of a sharp, relentless, pressing, vigorous cross examination as he verbally retraced foot-by-foot, second-by-second the crucial moments during which the two vehicles pursued their tragic fatal collision course.

We have emphasized the harmfulness of the ruling in terms of F.R.Civ.P. 61 since there can be no real doubt of the right to call the assured as an adverse witness. Though we say that in strong terms, we must acknowledge that, as may often be the case, the cause for the District Court's error must be laid at our feet. Thus it was that the District Court Judge interpreted our Reed case as casting doubts on our earlier Kador decision. In the final analysis, this doubt was generated by the parenthetical statement that "(though there is certainly much in the basic principles relating to examination of friendly and hostile witnesses to argue for such a limitation)", see note 7, supra.

But we do not consider that by that decision, we were either overruling or limiting Kador, or that such factors should cause a construction of "adverse" party in terms of intrinsic hostility versus sympathy to or for a cause.

■ At the outside it bears emphasis to point out that F.R.Civ.P. 43(b) covers two quite distinct things. The first sentence treats with witnesses who are hostile. Limited to a witness who is hostile or unwilling, that sentence likewise specifies the particular procedural remedy accorded. It states plainly that the party placing such a witness on the stand "may interrogate any unwilling or hostile witness by leading questions." This stands in contrast to the next sentence which grants the right to call an adverse

party. Not only is this right separately prescribed, but the remedial privileges afforded are quite different and significantly much broader. This includes the right to (a) "interrogate him by leading questions" to (b) "contradict," and (c) "impeach him" the same " * * * in all respects as if he had been called by adverse party * * *." F.R.Civ.P. 43(b).

■ The right to put leading questions to an unwilling or hostile witness was long recognized and the rule introduced no new principle.[8] But the addition of a specific right to call an adverse witness was new. It brought federal practice in line with the growing number of comparable state statutory provisions or court rules. Likewise, it served as a tangible, meaningful, though severely confined, protest against the long criticized dogma forbidding impeachment of one's own witness. It was a recognition that—as was so here—frequently the whole case not only turns in the end upon what the adversary knew or did, but that adversary is also the sole source of testimonial proof. The rule is an expression of historical experience unaffected by the intrinsic attitudes or relationship of the particular parties to a given suit. Significantly the rule is not stated in terms of a "hostile" or "unwilling" adverse party. The right is extended to any adverse party.[9]

■ As this Court pointed out through the characteristically straight forward language of Judge Jones in Kador, the question of who is an adverse party is not to be determined by who is the nominal party. "We do not think it was the intent of the Rule to provide that its application should be dependent upon the manner of the exercise by the injured person of his option to sue insured, insurer, or both. We think that the insured, the alleged tort-feasor, occupied an adverse position toward the injured party plaintiff and as such was an 'adverse party' within the meaning of Rule 43(b)." 225 F.2d 120, 123.

■ Under the Direct Action Statute, the case may proceed against the insurer, but liability depends on legal liability of the assured. Whether, as the Act permits, the assured is joined with the insurer, the standard for recovery is identical. That was certainly true in this case for beginning with formal pleadings, the opening statements of counsel, the arguments and charge to the jury and ending with the jury's answers to the F.R.Civ.P. 49 special interrogatories, the whole inquiry was simply this: was Lyle negligent and, if so, was his negligence a proximate cause?

■ It is plain that had Lyle been sued as the sole defendant or joined with the insurers as a co-defendant, he would have been an adverse party within F.R. Civ.P. 43(b). His absence—a matter of no significance under the Direct Action Statute as the controlling local substantive law—did not change matters where the nominal plaintiff, as to all issues then for jury resolution, stood in his shoes. Since the plaintiff as a matter of right could call the assured in the one situation, he may equally as a matter of right

8. See 5 Moore's Federal Practice §§ 43.10, 43.01–2 (1951). And of this Wigmore to his text, III Wigmore, Evidence § 774 (1940), in note 1 citing old Federal cases added in a parenthesis "( * * * it would be interesting to learn how it happened that the framers of these Rules, destined to make only a few formulations which might be needed to allay serious doubt or conflict of practice, decided to embody here one of the oldest truisms of that law of Evidence)." See also § 915.

9. As to these matters see: 5 Moore's Federal Practice § 43.10 (1951); III Wigmore, Evidence § 916 (1940), p. 431. "If there is any situation in which any semblance of reason disappears for the application of the rule against impeaching one's own witness, it is when the *opposing party is himself called by the first party*, and is sought to be compelled to disclose under oath that truth which he knows but is naturally unwilling to make known." (Italics in original) See also VI Wigmore, Evidence § 1890 (1940); 58 Am.Jur. Witnesses § 560, § 796.

do so when the suit is against the insurer alone.[10] Any effort by reason of the peculiar nature or circumstance of these Louisiana Direct Action cases to engraft upon the plain command of the Rule a contingent inquiry into the actual existence of, or the state of hostility, between the parties would be to introduce uncertainty and unsupported discrimination.

The volume of this Direct Action litigation in Louisiana Federal District Courts makes it important, and appropriate, for us to declare in plain terms that the assured, whether named as a party or not, is an adverse party and may be called as such under 43(b).

Reversed and remanded.·

JOSEPH C. HUTCHESON, Jr., Circuit Judge (dissenting).

This case was tried to a jury on a record of more than 200 pages and resulted in a verdict for the defendant. On appeal to this court, the majority opinion proposes a reversal of the judgment on the claim that the action of the court in declining to permit the driver of the automobile to be called as an adverse witness constituted reversible error. It does this, though this court, in Maryland Cas. Co. v. Kador, 5 Cir., 225 F.2d 120 had held that action on such a request *was within the trial court's discretion,* and in Pan American Cas. Co. v. Reed, 5 Cir., 240 F.2d 336, this court *approving the decision in the Kador case, held that in view of the wide latitude given the trial court in the method of examining witnesses generally, no harm* *had been shown to have resulted from the procedure and therefore no reversible error occurred from the court's ruling in this respect.*

The majority opinion goes counter not only to two apposite decisions in this court and also does complete violence to the long established limitation fixed by statute and rule on this court's power to reverse [1] except˙ where prejudicial error is shown to have resulted in the absence, as here, of a showing of harm resulting from the claimed error, I must vigorously dissent, especially since this court reverses the district judge in respect of action which the same district judge was encouraged to take by the action of this court in the two cases already tried by him, above cited. The majority recognizes this situation but airily waves it away by an unsupported assertion that the claimed error was harmful, and thus at once discredits the two prior decisions of this court and purports to furnish by assertion authority to hold that the action complained of constituted reversible error despite the controlling rule in this court and in all other federal appellate courts that error unless shown to be harmful cannot be made the basis of reversal. Note 1, supra. Since the majority opinion violates both of these rules, I respectfully dissent.

A careful reading of the record, including particularly the examination of the witness Degelos, shows that the witness testified fully and freely and without reservation on all of the questions asked him and that his testimony would

---

10. The Louisiana Direct Action suits are not the only ones in which the law has to reckon with a case of supposed friendly enemies, e. g., Automobile Guest cases.

1. Title 28 U.S.C. § 2111. "Harmless error":
 "On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties. Added. May 24, 1949, c. 139, § 110, 63 Stat. 105."
 Rule 61, Federal Rules of Civil Procedure:

"Harmless Error. No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

not have been different if he had been examined as an adverse witness. The majority opinion is not only violative of Sec. 2111 and Rule 61, F.R.Civ.P., note 1, supra, but is directly contrary to the two decisions of this court, cited above, and I must therefore

Dissent.