385 A.2d 650.

DAVID PUCCIO *v.* DIAMOND HILL SKI AREA, INC.

APRIL 11, 1978.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J.   This is a negligence action in which the plaintiff seeks damages for injuries he sustained in October 1966 as a result of a fall down a flight of stairs in premises owned by the defendant corporation. Nine years later, in February 1976, a Superior Court jury returned a verdict for the defendant.[1]   The trial justice denied the plaintiff's

---

[1] In his effort to recover damages, the plaintiff instituted three separate suits. In addition to the suit against the Diamond Hill Ski Area, Inc., he also brought suit against Norcum Food and Supply Co., Inc. and Raymond W. Costigan, and his

motion for a new trial, and the plaintiff is before us on an appeal in which he takes issue with three rulings made by the trial justice. Two of the rulings relate to evidentiary matters, while the third concerns the denial of the plaintiff's motion for a new trial. Hereinafter we shall refer to the plaintiff by his last name.

On the morning of October 24, 1966, Puccio went to the Diamond Hill Ski Area to deliver display racks for his employer, Peggy Lawton Kitchens. The building where Puccio was to make his delivery was a one-story, multi-purpose facility containing a snack bar, a dairy bar, and ski shop. The ski season was about to open, and the racks were needed to display sundry food products in the ski area's snack bar. Upon entering the snack bar portion of the building, Puccio met Albert Carrier. Carrier worked in the snack bar as a combination janitor-counterman and was the only other person present on defendant's premises on this particular day. According to Puccio, he introduced himself to Carrier and explained the purpose of his visit. Carrier, thinking that Puccio was a salesman, informed the visitor that Raymond W. Costigan, the owner, was not there and that he had no authority to make purchases. Puccio testified that, once he clarified the purpose of his visit, he was told that he could put the display racks on a shelf that was behind the snack bar's serving counter. He then attempted to climb over the counter but was stopped by Carrier, who informed him that he would have to approach the "back bar" from the kitchen and pointed out the route that Puccio should take in order to reach his destination.

---

wife, Merlyn. In this suit he alleged that he was lawfully on premises which were being controlled by Norcum and owned by the Costigans. When the summons directed to the Costigans was received by the plaintiff from the sheriff, it bore a "non est inventus" return. The plaintiff then, acting pursuant to G.L. 1956 (1968 Reenactment) §27-7-2, brought a direct suit against the Costigans' insurer, the Phoenix Insurance Company. Later, a pretrial order was entered in which it was stipulated that possession and control of the premises in question was in Diamond Hill Ski Area, Inc. It was also agreed that any judgment entered in the Diamond Hill case would be dispositive of the other two pending suits.

Puccio testified that to get to the kitchen, he walked from the snack bar area through an archway and into the ski shop. He circled a display case and then opened the first door on his right. At this point Puccio was looking into what he described as a small, dark hallway. Five or six feet in front of him, he claimed, he observed light shining from beneath what he thought was a door. He took one or two steps and suddenly fell down a flight of stairs, knocking himself unconscious. When he revived, he was lying on the cellar floor.

Carrier's account of what transpired once he informed Puccio that he had no authority to make purchases differed completely from what Puccio had described to the jury. Carrier testified that Puccio asked him if there were any display racks left over from the previous season. Carrier replied that there were, but they were in the cellar. The janitor-counterman then informed Puccio that no one could go into the cellar without the owner being present because valuable ski equipment was stored there. Carrier testified that he returned to his chores. Shortly thereafter, he said, he heard a noise from the cellar. He went over to the top of the cellar stairs, turned on the light, and saw Puccio at the bottom of the stairway.

Other defense witnesses pointed out that if all Puccio wanted was the chance to place the new racks on the back bar, there was absolutely no necessity for him to proceed through the ski shop. A portion of the snack bar was reserved for the clientele who preferred table, rather than counter service. There was a space between one end of the serving counter and the back bar so that those who served the table customers could go behind the counter, pick up their orders, and return to the table area.

Puccio's first claim of error is the trial justice's refusal to permit him to examine Carrier under G.L. 1956 (1969 Re-enactment) §9-17-14, the adverse witness statute. At trial, after he testified about his plunge down the stairway and his

injuries, Puccio called Carrier to the stand. He told the trial justice that he was doing so under §9-17-14. The trial justice excused the jury while he heard arguments as to the applicability of the statute. Ultimately, the trial justice ruled that Carrier did not come within the reach of the adverse witness statute.

Puccio's insistence that he be allowed to call Carrier and question him as if on cross-examination arose from the fact that at the time of trial he possessed an October 3, 1974 deposition by Carrier in which the janitor made numerous references to a "trap door" as being the cause of Puccio's fall.[2] Apparently, Puccio was dubious about whether the defense would have Carrier testify in its behalf so that this evidence would go before the jury. Consequently, he took the initiative and called Carrier to the stand. However, in the absence of a statute or judicially created exception, a party who calls a witness vouches for his credibility and cannot cross-examine him with full opportunity for impeachment. *State v. Robertson*, 102 R.I. 623, 232 A.2d 781 (1967); *Manocchio v. Pettine*, 84 R.I. 167, 122 A.2d 152 (1956); *Souza v. United Electric Rys.*, 51 R.I. 124, 152 A.2d 419 (1930); Wigmore, *Evidence* §896 (3d ed. 1940). Thus, if Carrier testified that the entrance to the cellar was a regular flush door, as defendant maintained, Puccio would not be able to bring to the jurors' attention that Carrier had previously stated that there was a "trap door." In Rhode Island we have both a statute and rule of civil procedure which permit a party, in appropriate circumstances, to cross-examine his own witness.[3]

---

[2]The multi-purpose structure was destroyed by a fire in March of 1967, and there were no plans of the building as it existed at the time of Puccio's plunge into the cellar. Evidence of the building's layout was presented through the testimony of witnesses who were familiar with it.

[3]Additionally, this court has stated that a trial justice in the exercise of sound judicial discretion may, if satisfied that a party has been surprised by the adverse testimony of his own witness or where the circumstances seem to require it in the interest of justice, allow a party to question the witness on prior statements that

The pertinent court rule is Super. R. Civ. P. 43(b), which provides for two categories of witnesses who may be cross-examined by the calling party — an adverse party and, if the adverse party is a corporation, partnership, or association, an officer, director or managing agent of such an entity.[4] A third classification is to be found in §9-17-14. This section states that "any other person whose interest is adverse to the party calling him, may be examined as if under cross-examination."[5]

The specific grounds upon which Puccio was relying in calling Carrier to the witness stand are unclear from the record. At one point he told the trial justice that he was proceeding in this manner because Carrier seemed to have an "extreme personal and paramount interest." A little later Puccio stated that Carrier was "an agent of the party, and as such has authorization to act for the party." The trial justice found that neither Rule 43(b) nor §9-17-14 supported Puccio's claim of entitlement to employ cross-examination techniques in questioning Carrier. He stated: "I will not permit you solely on the basis that he was an employee * * * he not being a party to the litigation * * * I don't believe he has an interest in this litigation * * *." Before us Puccio argues that he should have been allowed to cross-examine Carrier for any of the reasons delineated in Rule 43(b) and §9-17-14.

---

differ from his in-court testimony. *State* v. *Quattrocchi*, 103 R.I. 115, 235 A.2d 99, (1967); *Manocchio* v. *Pettine*, 84 R.I. 167, 122 A.2d 152 (1956); *Souza* v. *United Electric Rys.*, 51 R.I. 124, 152 A.2d 419 (1930). At no time did Puccio seek to rely upon the *Quattrocchi* principle.

[4]Super R. Civ. P. 43(b) states in its applicable portion: "A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party * * * ."

[5]We should note the relationship between Rule 43(b) and §9-17-14. For all practical purposes the statute and rule as written are identical as to what they provide with one major exception. The statute permits the trial justice to find adversity in a witness towards the party calling him even though the witness is not a named party to the suit.

We think it clear that Carrier was not a managing agent of his employer, Diamond Hill Ski Area, Inc. A managing agent has been defined as a person who is more than a mere employee but is one who "acts with supervisory authority, being invested with general powers to exercise his discretion and judgment in dealing with corporate matters and his interests are identified with those of the corporation." *Heater* v. *Chesapeake & Ohio Ry.*, 497 F.2d 1243, 1248 (7th Cir. 1974). The trial justice is to look at the facts of each case and base his decision on such factors as the person's authority to control the conduct of other employees, the type of duties he performs and whether they distinguish him from other workers, his specialized training, and the extent of his responsibilities in the day-to-day operation of the corporation of a particular department over which he has authority. *Skogen* v. *Dow Chemical Co.*, 375 F.2d 692 (8th Cir. 1967); *Brandon* v. *Art Centre Hospital,* 366 F.2d 369 (6th Cir. 1966). It is difficult to see how Carrier, a combination janitor-counterman who, it is conceded, could not even give an order to Puccio for some cookies from Peggy Lawton Kitchens, can now be said to act with supervisory authority over corporate matters.

We need not, however, decide whether the trial justice was correct in holding that Carrier was neither an adverse party[6] nor a person whose interest is adverse to the party calling him. We shall assume that the trial justice erred

---

[6]There are two lines of cases regarding who is an adverse party. Annot., 35 A.L.R.2d 756 (1954). The first is simply that an adverse party is one who is adversely aligned in the pleadings. *Alm* v. *General Telephone Co.*, 27 Ill. App. 3d 876, 327 N.E.2d 523 (1975); *Serafin* v. *Peoples Community Hospital Authority,* 67 Mich. App. 560, 242 N.W.2d 438 (1976); *Kauffman* v. *Carlisle Cement Products Co.,* 227 Pa. Super. 320, 323 A.2d 750 (1974). A second approach, which has been principally followed by the federal courts, is to construe Rule 43(b)'s "adverse party" so as to include any person who could have been sued either instead of or jointly with the named defendant, and the standard of recovery against either is identical. *Melton* v. .*O.F. Shearer & Sons, Inc.,* 436 F. 2d 22 (6th Cir. 1970); *Chumbler* v. *Alabama Power Co.,* 362 F. 2d 161 (5th Cir. 1966); *Degelos* v. *Fidelity & Casualty Co.,* 313 F. 2d 809 (5th Cir. 1963). Puccio claimed he could

when he refused to allow Puccio to cross-examine Carrier,[7] but such error was, in our opinion, harmless. When defendant presented its case, Carrier appeared as a witness. Puccio was then given, and took full opportunity of, his right to cross-examine the witness. For 30 pages of transcript and 194 questions, Puccio questioned Carrier in great detail about the events surrounding the fall. The jury had before it four different hand-drawn sketches of the area near the snack bar and ski shop. Three of the four were prepared by counsel for the litigants at the time of the taking of Carrier's October 1974 deposition. The fourth one had been prepared a month earlier by an individual whose occupation at this time is unknown. All four sketches were made in Carrier's presence and with his suggestion and advice. All four show a trap door. The three used at the deposition show the trap door at the head of the cellar stairs. Consequently, the jury was well aware that a little over a year prior to trial Carrier had testified under oath as to the presence of a trap door near the area where Puccio was injured. It is our belief that Puccio was able to develop every point he originally hoped to when he called Carrier in his case-in-chief. Since Puccio was not prejudiced by the trial justice's ruling, we must deny this facet of his appeal.[8]

---

have sued Carrier because of the counterman's failure to warn him about the open stairwell.

The Federal Rules of Evidence became effective on July 1, 1975, and on that date an amended version of Fed. R. Civ. P. 43 also took effect. There is no longer a Fed. R. Civ. P. 43(b) because of the pertinent provisions of Fed. R. Evid. 607 and 611. Rule 607 states that the credibility of a witness may be attacked by any party, including the party who called the witness. Rule 611(c) states that "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions."

[7]Although the trial justice did not find the requisite adversity that would warrant Puccio's employing the statute, he did tell Puccio's counsel that he was free to attempt to show Carrier's hostility. Counsel made no effort in this regard. However, even if he had established hostility, his remedy under the first sentence of Rule 43(b) would have been limited to the asking of leading questions.

[8]Puccio nevertheless claims that he was prejudiced because Carrier was present in the courtroom throughout the trial and had an opportunity to refresh his memory by listening to the testimony of other witnesses. If he had been permitted

Puccio's next contention is that the trial justice erred when he permitted Raymond Costigan, the sole stockholder of the corporate defendant, to testify about the lighting conditions that existed at times other than the day of the mishap in and about the area where Puccio fell. The issue arose becasue the defense took the position that even if Carrier did tell Puccio to go into the kitchen area, if the sun was out, as Puccio testified, once he opened the door leading to the cellar, he should have seen the landing at the top of the staircase, and as he proceeded to the forward edge of the landing, he would have seen a considerable portion of the stairs.

On direct examination Costigan was asked about the position of the windows in the building and the light that found its way into the area near the cellar door on an ordinary day when the sun was shining. He answered that the lighting was good. A short while after, he was asked if he had ever opened the cellar door on a day when the sun was out in the morning and when there was no source of artificial lighting. Costigan replied, "Yes," whereupon the following question and answer were given:

> "Q. When you did have occasion on a similar day, to open the door to the cellar, before you used the light switch, and while the lights were still out in the cellar, did you have occasion to note what you could observe inside the cellar door?
>
> * * *
>
> "A. I could see, you could detect with faint lighting, the landing and maybe one-third of the way down the stairs."

Puccio had objected to this entire line of questioning.

---

to call Carrier as an adverse witness, Puccio maintains that the effect of his cross-examination would have, therefore, been greatly enhanced. Again, assuming the viability of such a contention, Puccio had every right to request that Carrier be excused from the courtroom during the examination of other witnesses, but he failed to make such a demand of the trial justice. *See Poirier* v. *Poirier*, 107 R.I. 345, 267 A.2d 390 (1970).

Although this court has never decided the issue before, it is generally recognized that proof of the fact of particular intangible conditions such as light, sound, or color at the time of the event which is the basis of litigation may be had by evidence of other persons' experiences in seeing or hearing the condition under similar circumstances. *Detroit, T.&.I. R. Co. v. Banning,* 173 F.2d 752 (6th Cir. 1949); *Dobosz v. Nyren,* 131 Conn. 270, 38 A.2d 684 (1944); *City of Fort Worth v. Lee,* 143 Tex. 551, 186 S.W.2d 954 (1945); Wigmore, *Evidence* §460 (3d ed. 1940).[9]

The decision as to the admission of such evidence is a question of the relevancy of the other observations and, as with other relevancy determinations, is vested in the discretion of the trial justice. In making his ruling, the trial justice should consider whether there is substantial similarity in the conditions and observations, and it is the proponent of the evidence who bears the burden of satisfying the trial justice of this foundational requirement. Here the trial justice was of the opinion that a proper foundation had been laid, and our review is limited to a determination of whether he abused his discretion in making this determination. A review of the record satisfies us that there was no such abuse.

Costigan testified at length on the layout of the building and the location of windows. He also explained that he had on numerous occasions and in various types of lighting conditions observed different areas of the facility. His testimony showed that he had opened the cellar door under circumstances similar to those existing at the time of the mishap. The trial justice was careful to insure that there was a similarity between what Puccio would have seen and what the witness had observed, and he sustained Puccio's objections to several questions when he was not satisfied that the requisite similarity of conditions had been established. Only after the witness gave further testimony

---

[9]The same issue more typically arises in cases where a party seeks to introduce evidence of pretrial experiments made to test the observations of witnesses at the time of the event. *See* Annot., 78 A.L.R.2d 152 (1961).

about his other observations did the trial justice admit the testimony. There was ample evidence from which the trial justice could find that the foundation had been laid, and we cannot say that he abused his discretion.

A litigant who on appeal to this court challenges a trial justice's denial or grant of a motion for new trial which is based upon the assertion that the jury's verdict is against the weight of the evidence bears the burden of convincing us that the findings on which the trial justice relied in disposing of the new trial motion were either clearly wrong or based upon a misconception or overlooking of material evidence on a controlling issue in the case. *Grenier* v. *Royal Cab, Inc.*, 117 R.I. 475, 368 A.2d 1232 (1977); *Lemieux* v. *American Universal Insurance Co.*, 116 R.I. 685, 360 A.2d 540 (1976); *Gordon* v. *Campanella Corp.*, 112 R.I. 417, 311 A.2d 844 (1973).

Puccio, in taking on this burden, first contends that the trial justice, in denying the new trial motion, erred when he referred to certain portions of the evidence. Admittedly, in considering the new trial motion, the trial justice did say that Puccio's fall occurred in August of 1966, when it actually occurred 3 months later, in October. Again, the trial justice, in commenting on the evidence, remarked: "I think Mr. Puccio is mistaken when he testifies that Mr. Carrier was behind the counter, for it would have been a simple thing to leave the Racks with Mr. Carrier * * *." The record clearly indicates that it was Carrier who testified that he, Carrier, was behind the counter when Puccio entered the snack bar. In fact, Puccio testified that upon his initial entry Carrier was sitting on a stool in front of the counter.

Nobody disputes the trial justice's erroneous reference to the date of the mishap or where the counterman was positioned when Puccio approached him bearing the new cookie racks. The sole question is whether an inadvertent reference to the date of an incident that occurred 9 years prior to the trial and the trial justice's mispositioning of

Carrier amounted to a misconception of material evidence on controlling issues. We do not believe they do.

In this jurisdiction a trial justice, as he considers a new trial motion, must make an independent appraisal of the testimony in the light of his charge to the jury, during which he may pick and choose whom and what he will believe as he weighs the evidence and assesses the credibility of the witnesses. Once the trial justice has completed his evaluation of the testimony, he then determines whether the evidence adduced at trial is such that the controversy as presented to the jury is one upon which reasonable minds could differ as to the conclusion the factfinders should reach or whether the jury's verdict is contrary to the fair preponderance of the evidence. *Barbato* v. *Epstein*, 97 R.I. 191, 196 A.2d 836 (1964). If the trial justice, because of his more experienced judgment, finds that the dispute comes within the reasonable-minds-could-differ category, he will deny the new trial motion. On the other hand, if he believes the controversy to be one where the verdict is against the fair preponderance of the evidence, he must grant a new trial.

In his charge to the jury, the trial justice stressed that Puccio had the burden of proving that defendant was negligent and that Puccio's actions did not in any way contribute to his fall. Later, when the trial justice was considering the new trial motion, he pointed out that the jury was presented with evidence from which it could conclude that Puccio, in traveling towards either the kitchen or the cellar, was proceeding through an area that was entirely foreign to him. The trial justice, after specifically rejecting Costigan's claim that an abundance of natural light illuminated the stairway area, concluded that it was actually dark at the entrance to the stairs. To buttress his conclusion, the trial justice referred to Carrier's testimony where the counterman said he turned on the light and saw Puccio coming up the cellar stairs.

After making these observations, the trial justice observed that these facts formed a basis upon which the jury could have returned a defendant's verdict on the ground that Puccio was not in the exercise of due care for his own safety as he walked through a darkened area towards a threshold of light. The trial justice also remarked that there was other evidence from which the jury might well have found that Puccio was injured while he was attempting to find the old racks in the cellar. There is no question but that the trial justice made an independent and extensive evaluation of the evidence. After he had completed his evaluation, the trial justice classified the state of the evidence as one "where reasonable minds might have disagreed." In essence, the trial justice ruled that there was evidence adduced at the trial which, if believed, would have justified the verdict for either litigant. The jury believed that evidence which justified a defendant's verdict. The trial justice found no reason to disturb the jury's choice, and we see no reason to fault his choice. ·

We would point out, as we have so many time before, that the fact that a trial justice fails to do what is expected of him when he decides a motion for new trial does not automatically guarantee the appellant a new trial. In such instances this court will review the record and grant a new trial if the evidence as viewed from an appellate level "substantially preponderates" against the jury's verdict. Since credibility is beyond our power, we examine the record in the light most favorable to the prevailing party to see if there is any competent evidence which supports the jury's verdict. *Morinville* v. *Morinville*, 116 R.I. 507, 359 A.2d 48 (1976). Applying this standard, we need only refer to the testimony presented by the defense. The answer is obvious. There is competent evidence supporting the jury's verdict.

The plaintiff's appeal is denied and dismissed.

Mr. Justice Paolino participated in the decision but retired prior to its announcement.

*Swan, Jenckes, Asquith & Davis, Harry W. Asquith, Conrad M. Cutcliffe*, for plaintiff.

*James M. Shannahan, Joseph H. Parys*, for defendant.