235 A.2d 99.

STATE *vs.* ANTHONY A. QUATTROCCHI

NOVEMBER 14, 1967.

PRESENT: Roberts, C. J., Paolino, Powers and Joslin, JJ.

JOSLIN, J. The defendant, indicted and tried for manslaughter, was found guilty by a jury in the superior court. After his motion for a new trial was denied, he brought his bill of exceptions to this court.

Shortly after midnight on November 24, 1963, defendant met the decedent, Docanto, in a parking lot adjacent to

Samson's diner in Pawtucket. An argument developed and a fight followed. The police were called, but by the time they arrived defendant had left the scene. They found Docanto lying face down in a shallow pool of water. He was dead. The cause of death as testified to by the doctor who performed the autopsy was that "death was due to drowning following the receipt of several blunt force injuries to the head."

Later that morning three persons who had been with defendant at or about the time of the killing were apprehended by the police and thereafter questioned at the police station. Each signed a separate statement. The next afternoon defendant voluntarily went to the police station and he too was interrogated. Upon completion of their investigation, the police charged defendant with the homicide and his conviction followed.

At the outset we summarily dispose of defendant's contentions that there were reversible errors in the allegedly improper manner in which the trial justice first questioned and later rebuked a defense witness, and in the state's having called as a witness a person whom the prosecutor knew or had reason to anticipate would invoke a constitutional claim of privilege. Those contentions, however meritorious they may be when stated in the abstract as they have been by defendant, are not only of doubtful validity in this case, but are not properly before us.

Under our long settled and well-established appellate procedures, we limit our review in criminal cases[1] to rulings made in the course of a trial to which exceptions have been properly reserved. It is the exception which enables a party to bring upon the record that he has made a legal objection

[1] A strict compliance with the procedural requirements may be excused where insistence would deprive a defendant of his constitutional protections. Concurring opinion of Joslin, J., in *State* v. *Dufour*, 99 R. I. 120, 206 A.2d 82, 88; *State* v. *Mendes*, 99 R. I. 606, 210 A.2d 50, 56.

to a ruling; and that exception must relate to a specific ruling or decision. A blanket or a general exception will not suffice. *State* v. *Amaral,* 47 R. I. 245, 132 A. 547; *State* v. *Braica,* 78 R. I. 32, 78 A.2d 374; *State* v. *Mastracchio,* 78 R. I. 496, 82 A.2d 889; *State* v. *Ruggiero,* 93 R. I. 241, 174 A.2d 555. Here, defendant neither in his brief nor in his oral presentation, pointed to any specific rulings or exceptions which are referable to the conduct he now finds objectionable and to which he so strenuously protests. In these circumstances there is nothing for us to review.

He contends also that the prosecutor's argument to the jury exceeded the bounds of propriety and thereby deprived him of a fair and impartial trial. The nature and extent of the limitations binding upon a prosecutor when he argues to a jury were considered by us at length in *State* v. *Kozukonis,* 100 R. I. 298, 304-306, 214 A.2d 893, 897. The sum of our holding was that a prosecutor may express his belief in the guilt of an accused so long as it is based on the evidence; he is prohibited from expressing any such belief if it will reasonably permit the jury to infer that it stems from reasons or knowledge outside of the record.

In this case defendant finds impropriety in the following portion of the prosecutor's summation to the jury:

> "* * * Call this case as you conscientiously believe it should be called, if you do, justice will triumph again today in Rhode Island, because in my judgment, Mr. Foreman and ladies and gentlemen of the jury, on the basis of the law, *and on the basis of the credible evidence that you have heard in this case,* your verdict should be a verdict that has no other alternative than that the defendant, Anthony A. Quattrocchi, is guilty as charged." (italics ours)

True, the prosecutor appealed to the jury to find defendant guilty as charged. That appeal, however, was premised, not on anything outside of the record or otherwise peculiarly within his own knowledge, but on the credible evi-

dence which had been presented in the case. We find nothing in that argument which trespasses beyond the permissible bounds set out in *State* v. *Kozukonis, supra.*

More troublesome than the foregoing contentions is defendant's further claim that the trial justice abused his discretion by permitting the state to use for impeachment purposes the prior statements of Frank Bianchini, George Bianchini, and James Landi, defendant's three companions on the morning of November 24th.

The defendant, in his argument as well as in his brief, treated his various exceptions to the rulings made to the admission of the pretrial statements of each of these witnesses as raising identical legal issues; he used Frank's testimony to pinpoint those issues. We follow his lead and do likewise.

Frank was the first of the three to be called by the state and took the witness stand on May 26, 1965. Notwithstanding that only 18 months had intervened between the date of the killing and his appearance in court, his memory of what he had seen and heard on the morning of the killing had dimmed. He remembered having seen defendant on the Samson's diner parking lot talking to a stranger on the morning of November 24th, and that he was a passenger in an automobile in which defendant, shortly after the parking lot incident, was driven from the vicinity of Samson's diner. He was unable to recall, however, whether he had seen defendant engage in a fight on the parking lot or whether, while riding in the automobile, he had heard defendant discuss or in any way refer to the killing.

At this juncture of the examination, the prosecutor handed the witness a statement dated November 24, 1963 at 6:00 a. m. It was identified as having been prepared by the police following the witness's interrogation in the early morning hours of the 24th and Frank admitted having signed it. After examining and reading the statement, he insisted that

it in no way refreshed his recollection of the events of that morning, and he also said that "Most of the stuff is all untrue" and that "* * * it mixes up most of my recollection of what happened, because most of these things are lies."

Thereupon, the prosecutor, without first claiming surprise, read aloud in the jury's presence those portions of the statement in which the witness purportedly quoted defendant as having said as they were driving in Landi's automobile: "I think that I killed him, he's laying [sic] face down in the puddle," and again, "We sat in this car talking about what had happened. Quattrocchi then said again, that he thought he had killed a guy. I asked Quattrocchi what he had hit the guy with, a stone. Quattrocchi said, Don't ever say I hit anybody with anything."

The witness, although agreeing what had been read in fact appeared in the statement, denied having heard defendant make those comments, and in addition attempted during cross-examination to explain what appeared by saying that he had signed the statement without having first read it, and that the police in purporting to quote him had fabricated.

The question is whether these purported pretrial statements of the witness were admissible under the rule of evidence which prohibits a party from impeaching his own witness by proof of a prior inconsistent statement. It is troublesome, not because the answer is doubtful, but because the state's attorney and defense counsel, both experienced trial counsel, are completely at odds in their understanding of the nature and extent of our impeachment rule. It is for this reason that our discussion is more detailed than it might otherwise be.

The rule's historical origins are obscure, and various hypotheses as to its beginnings are advanced. One explanation is that it may have originated in medieval times when the mode of trial was known as "compurgation" or trial by

wager of law. Under that method of trial, a party, instead of calling as his witnesses persons knowledgeable of the events pertinent to the litigation, customarily would call only his friends and relatives. They were known as "oath-helpers," and the issues were determined upon their "oaths." Naturally, they were partisans, and it was expected that those called would testify in behalf of the party calling them, and that they would swear that he spoke the truth. Professor Wigmore says that "So long as such a notion persisted, it was inconceivable that a party should gainsay his own witness; he had been told to bring a certain number of persons to swear for him; if one or more did not do so, that was merely his loss; he should have chosen better ones for his purpose. This notion that a party must stand or fall by what his partisan affirms was long in disappearing." 3 Wigmore, Evidence (3d ed.) §896, p. 383.

It has also been suggested that the source of the rule may lie in the gradual transition from the inquisitorial to the modern-day adversary system of trial. When trial by inquest was the mode, the practice was to select the jurors, or recognitors, as they were called, from among those who were acquainted with the case, and they resolved the issues upon their own knowledge of its facts. Along with the change from the old to the present day system came the opportunity to call as witnesses those who could testify to what they had observed. That opportunity originally was a privilege, rather than a right, and it was anticipated that a party exercising the privilege would be bound by what his witness said and would not wish to challenge him as being unworthy of belief. Ladd, "Impeachment Of One's Own Witness — New Developments." 4 U. Chi. L. Rev. 69.

Whatever may have been its origin, the acceptance of the principle forbidding the impeachment of one's witness was by the end of the 1700's "notorious and unquestioned." Wigmore, *supra,* at 385. It was first stated, although not

without qualification, by this court in *Hildreth* v. *Aldrich,* 15 R. I. 163, 1 A. 249 (1885). Two exceptions to a strict insistence upon the letter of the rule were recognized. The first was that the rule would not apply where the witness was one whom the law obliged a party to call;[2] and the second was that a party who was *disappointed* in the testimony of his witness might be allowed

> "* * * to ask him if he has not made contradictory statements, for the purpose of refreshing the witness's recollection. * * * We know of no case which holds that, if the witness's recollection is not thus refreshed, the contradictory statements may be put in evidence by other witnesses. It is very clear that, if the only purpose is to refresh the witness's recollection, the purpose can be served as well by questions in regard to the statements as by proof of them * * *." *Hildreth* v. *Aldrich, supra,* at 164, 1 A. at 250.

The traditional rule laid down in *Hildreth* controlled until the court in *Barker* v. *Rhode Island Co.,* 35 R. I. 406, 87 A. 174 (1913), relaxed it by holding that a trial justice in the exercise of sound judicial discretion might, if satisfied that a party had been *surprised* by the *adverse testimony* of his own witness, allow such portion of the testimony, taken at a previous trial as differed from present testimony, to be read to the witness. In addition to relaxing the *Hildreth* rule, the decision in *Barker* also casts doubt upon the rationale of the earlier case by suggesting perhaps the court there may have indulged "in a confusion of thought and of legal principle" when it advanced refreshing of recollection as the sole purpose for allowing evidence of this character.

*Barker* was followed in *State* v. *Saccoccio,* 50 R. I. 356, 147 A. 878, and then expanded in *Souza* v. *United Electric*

---

[2]This exception was followed in *Newell* v. *White,* 29 R. I. 343, 73 A. 798, where a party was allowed to impeach a subscribing witness to a will for the reason that the witness was not one of his own selection, but one who by law had to be called.

*Rys.,* 51 R. I. 124, 152 A. 419, where we suggested to trial justices that they should "* * * grant some latitude to counsel who is surprised by his witness's answer, especially when counsel has the transcript of the witness's testimony at a former trial." Later in *Manocchio* v. *Pettine,* 84 R. I. 167, 122 A.2d 152, we again enlarged the area of admissibility and said that a trial justice might exercise his discretion in favor of the admission of a prior inconsistent statement "where the circumstances seem to require it in the interest of justice * * *."

Two other facets of the rule deserve mention. The first has to do with the effect of the prior inconsistent statement. Although there are eminent scholars[3] who believe that the earlier statement being closer to the events is superior in trustworthiness and should therefore have substantive value and be considered as proof of the facts which appear therein, under our rule its effect is limited to neutralizing the pre-trial statement and to impeaching the credibility of the witness. *Yellow Cab Co.* v. *Public Utility Hearing Bd.,* 99 R. I. 644, 210 A.2d 128; *State* v. *Brown,* 96 R. I. 236, 190 A.2d 725; *Guglietti* v. *United Electric Rys.,* R. I., 137 A. 698.

Correlative to this limited effect concept is the obligation incumbent upon the trial justice to caution the jury on the effect they are permitted to give to the inconsistent statements. We approved the giving of such an instruction in *State* v. *Brown, supra,* and the authorities generally require a clear and direct admonition to be given either at the time of the admission of the statement or in the charge to the jury, or on both occasions. *State* v. *Gallicchio,* 44 N. J. 540,

---

[3]McCormick, Evidence (1954) chap. 5, §39, pp. 73-82; Morgan, "Hearsay Dangers And The Application Of The Hearsay Concept," 62 Harv. L. Rev. 177, pp. 192-196. Professor Wigmore while not subscribing to view that the earlier statement has superior credibility nonetheless takes the position that it has "affirmative testimonial value." 3 Wigmore, *supra,* §1018, p. 687.

210 A.2d 409; *People* v. *Tate,* 30 Ill.2d 400, 197 N.E. 2d 26. So basic is this requirement that a failure to comply constitutes fatal error in jurisdictions where, unlike ours, plain error affecting substantial rights may be considered on review even though not raised at trial. *Upham* v. *United States,* 328 F.2d 661.[4]

The second facet deals with the *Barker* requirement which ties admissibility to surprise and permits the admission of prior inconsistent statements under this exception only if the trial justice finds that the counsel is surprised, that is that he had no prior knowledge that the witness would testify contrary to his earlier statement. Such a determination is a precondition to admission, and any hearing preceding the finding should be held in the absence of the jury. *State* v. *Robertson,* 102 R. I. 623, 232 A.2d 781; *State* v. *Gallicchio, supra.*

Our review of the decisions makes clear that our rule, which, of course, presupposes a proper foundation, allows a party to introduce evidence of his own witness's prior inconsistent statements for the announced limited purpose of neutralizing the adverse trial testimony and of impeaching the credibility of the witness if the trial justice in the exercise of a sound judicial discretion is satisfied that counsel has been surprised or if in his judgment the circumstances seem to require it in the interests of justice.

Clearly, in arriving at this rule we have whittled away much of the earlier prohibition against admissibility; and perhaps in allowing such evidence, whenever the interests of justice seem to require it, we may have yielded to the concept that the prohibition has no place in a system which is dedicated to the ascertainment of truth and the achieve-

---

[4]Rule 52(b) of the federal rules of criminal procedure permits a reviewing court to notice plain errors affecting substantial rights even though not raised at trial.

ment of justice.[5]  Whether we have as yet acquiesced or whether we should are questions, however, which under the facts of this case need not be answered.

We now apply our rule to the facts of this case.  The witness's prior inconsistent statements, if admissible at all, could have come in only because the circumstances could fairly and reasonably be deemed to require it in the interests of justice.  The surprise exception was not available inasmuch as there had been no finding that the prosecutor was surprised by the witness's adverse testimony.

The setting in which the question of admissibility came before the trial justice was that the witness on the stand, a companion of defendant at or about the time of the commission of the crime, had categorically denied knowing any facts which might implicate defendant in the killing and had additionally testified that a statement prepared by the police and signed by him within a few hours after the killing had in no way refreshed his recollection of the events of the morning of the 24th.  That same witness, in the early stages of his testimony, unsuccessfully attempted to avoid testifying at all by invoking his constitutional privilege. In those circumstances, can it be said that the trial justice abused his discretion in concluding that the interests of justice required him to allow the jury to be informed of whatever impeaching matter might be contained in the police report?  We think not.

Those of the defendant's exceptions which he has briefed and argued are overruled, those neither briefed nor argued

---

[5]This position is supported in Ladd, "Impeachment Of One's Own Witness — New Developments," 4 U. Chi. L. Rev. 69, 96; Schatz, "Impeachment Of One's Own Witness: Present New York Law And Proposed Changes," Cornell L. Q. 377, 394 (1942); Note, "Impeaching One's Own Witness," 49 Va. L. Rev. 996 (1963). In addition the common law rule has been abolished by legislative action and in suggested model evidentiary rules. 2 Wyoming Statutes (1957) §1-143; Model Code of Evidence rule 106 (1) 1942; Uniform Rules of Evidence rule 20.

are deemed to have been waived, and the case is remitted to the superior court for further proceedings.

*Herbert F. DeSimone,* Attorney General, *Donald P. Ryan,* Assistant Attorney General, for plaintiff.

*Leo Patrick McGowan, Richard P. Kearns,* for defendant.