STATE

v.

**Raul VARGAS.**

**No. 78–85–C.A.**

Supreme Court of Rhode Island.

Sept. 16, 1980.

Dennis J. Roberts, II, Atty. Gen., Faith A. LaSalle, Sp. Asst. Atty. Gen., for plaintiff.

Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

BEVILACQUA, Chief Justice.

This is a criminal appeal from the defendant's judgment of conviction for first-degree murder in violation of G.L. 1956 (1969 Reenactment) § 11–23–1.

The defendant, Raul Vargas, and the victim, Angel Lopez, were involved in a heated discussion outside Louis' Bar in Pawtucket sometime after midnight on September 4, 1976. It is not disputed that Angel Lopez provoked the confrontation by insulting defendant and his wife, and defendant testified that Lopez, challenged him to a fight with knives. The two were separated, and subsequently defendant left the bar with a childhood friend from Puerto Rico, Eduardo Guitard, to help fix Guitard's automobile, which had broken down earlier in the evening on Interstate 95. Instead of driving directly to I–95, however, defendant and Guitard stopped for some beer at a friend's apartment in Crook Manor, a project in Pawtucket. What ensued after their arrival at Crook Manor was the subject of a considerable amount of conflicting testimony in pretrial hearings and at trial.

Debra Lewandowski testified that at about 1 or 1:30 a.m. she observed defendant and Guitard drive up in front of the apartments. She then saw the driver of the car, defendant Vargas, get out of the car, go to the trunk, and remove a "big long box," which he then put into the back seat of the car. Shortly thereafter, he put the box back into the trunk. She also testified that about five minutes later, another car pulled up directly behind defendant's car. The occupants of the second car, among whom was Angel Lopez, immediately got out and began conversing among themselves. Miss Lewandowski testified that defendant then got out of his car, whereupon he and Angel Lopez once again began to curse and insult each other. The defendant then returned to his car, took out the shotgun, and walked back toward Lopez. According to Miss Lewandowski, Lopez had his hands in his pockets and said that "he didn't want trouble," but Vargas "just put the gun in [Lopez's] mouth and he shot." She testified that defendant then got into his car and drove away.[1]

The defendant took the stand and testified that when Angel Lopez and his friends arrived at Crook Manor, Guitard got out of the car to talk to them. The defendant said that he remained in the car. After a short while, however, defendant got out of the car to attempt to persuade Guitard to leave. According to Vargas, Angel Lopez interrupted and began cursing and insulting defendant. The defendant testified that because he was outnumbered, he became worried that Lopez and his friends might plan to attack him. He therefore returned to his car, took the keys out of the ignition, opened the trunk, removed the box containing the shotgun, took it to the back seat, and assembled and loaded it. He then walked toward the group, holding the shotgun across his chest, and asked Lopez why he was looking for trouble. Then, according to defendant, Lopez approached him with his hands in his pockets. When Lopez got close, defendant, fearing that Lopez had a knife concealed and concerned about the others, attempted to push Lopez back with the shotgun. He testified that as he was looking at the others, the shotgun went off. He saw Lopez fall backwards but did not think that Lopez had been shot. The defendant then got into his car and drove off.[2]

The state called Eduardo Guitard as its witness at trial, expecting him to corroborate Debra Lewandowski's testimony concerning the timing of defendant's actions immediately before the shooting. The prosecutor based this expectation on pretrial

---

1. In response to counsel's questions, she asserted that she saw no other guns and heard no other gunshots that evening. At a hearing in September 1976, however, she had testified that she had indeed heard two gunshots. At trial she could not remember having made that statement.

2. The defendant testified that while he was at Crook Manor, he did not see another shotgun, nor did he hear another gunshot.

discussions with Guitard and on a written statement given by Guitard to the Pawtucket police three hours after the shooting on the morning of September 4, 1976. In that statement, Guitard asserted that well before Angel Lopez arrived, defendant had taken the shotgun out of the trunk and had assembled it in the back seat. The defendant allegedly told Guitard that he wanted to be prepared in case Lopez should come to Crook Manor. During the trial, however, Guitard altered the substance of his previous testimony; and the trial justice permitted the prosecutor to use the prior, inconsistent statements to impeach his own witness.

The defendant contends that the trial justice's decision to allow the prosecutor to impeach Guitard was erroneous. He also argues that it was an abuse of discretion to deny defendant the opportunity to be heard and to rule that Guitard had surprised the prosecutor in the absence of a specific allegation of surprise. Finally, he contends that the decision to admit the police statement as an exhibit was also erroneous.

In *Hildreth v. Aldrich*, 15 R.I. 163, 1 A. 249 (1885), this court stated that although a party may attempt to refresh his witness's memory by referring to prior contradictory statements, he may not introduce those statements to impeach. It is now well settled in this jurisdiction, however, that a party who is surprised by his own witness's testimony may be permitted, in the discretion of the trial justice, to confront the witness with prior inconsistent statements. *State v. Robertson*, 102 R.I. 623, 627, 232 A.2d 781, 784 (1967). The rule that a party may not ordinarily impeach his own witness may also be relaxed even in the absence of an allegation and finding of surprise when, in the view of the trial justice, the interests of justice so require. *State v. Quattrocchi*, 103 R.I. 115, 124–25, 235 A.2d 99, 104–05 (1967); *accord, State v. Giorgi*, 115 R.I. 1, 6, 339 A.2d 268, 271–72 (1975).

The record before us indicates that on direct examination Guitard testified that he and defendant had had no conversation in the car before Lopez's arrival. The prosecutor was clearly disappointed by the witness's failure to recall the conversation. He attempted to refresh Guitard's recollection by referring to the police statement and transcripts from prior hearings. When in response to the prosecutor's questions about the timing of Vargas's assemblage of the shotgun the witness stated that he had not seen the gun until Vargas brought it out *after* Angel Lopez had arrived, the trial justice immediately sent out the jury. The bench conference focused on the prosecutor's privilege to employ the police statement as a prior, inconsistent statement to neutralize the adverse testimony under the rule of *State v. Giorgi, supra*. The trial justice, however, was concerned that the premature admission and use of the police statement to impeach a witness whose trial testimony had not been fully developed would conflict with the rule that such statements may not be considered by the jury for their substantive content. *See State v. Quattrocchi*, 103 R.I. at 123, 235 A.2d at 104. He therefore did not allow the prosecutor to impeach Guitard at that point.

On cross-examination, the witness testified that he and "Junior" Augustine, one of Angel Lopez's friends, had struggled for control of a second rifle and the gun had discharged; about two seconds later, defendant's shotgun delivered the fatal shot through Lopez's mouth. On redirect examination, the prosecutor immediately referred to the police statement and had it marked for identification as an exhibit. He then proceeded to lay a foundation for impeaching Guitard, whereupon defense counsel objected. But the trial justice ruled that the witness had surprised the prosecutor and had become hostile. He then permitted the impeachment to proceed.

The defendant's contentions have merit only if in this case there was no finding of surprise or if the interests of justice did not necessitate the use of the statement for impeachment of the witness. *See State v. Quattrocchi*, 103 R.I. at 124, 235 A.2d at 104. In *Quattrocchi*, we held that the statements were not admissible

under the surprise exception because the trial justice had made "no finding that the prosecutor was surprised by the witness's adverse testimony.[3]" *Id.* at 125, 235 A.2d at 105. In the instant case, the trial justice specifically found that the prosecutor had been surprised. What defendant contends, however, is that the admission of the statements under the surprise exception was an abuse of discretion because it was preceded neither by an allegation of surprise nor by a voir dire hearing in which the defendant would have had an opportunity to be heard. We believe the record, viewed objectively, indicates otherwise. First, during direct examination the prosecutor expressed his surprise, although perhaps somewhat inartfully. That the prosecutor was surprised was clear to the trial justice when, *sua sponte*, he sent the jury out after the witness had testified that he did not see Vargas assemble the shotgun in the car prior to Lopez's arrival. Immediately after the jury had left, the trial justice in fact conducted a hearing on the prosecutor's privilege to impeach by prior statements during which defendant's counsel was heard. The trial justice recognized that privilege but declined to permit the prosecutor to exercise the privilege because the witness's testimony had not been developed. He specifically indicated, however, that he would permit impeachment if the witness's testimony had the effect of absolving defendant. Having observed the prosecutor's obvious surprise during direct examination and having afforded both parties an opportunity to be heard on the issue, the trial justice did not abuse his discretion when on redirect examination, he permitted the prosecutor to attempt to neutralize the adverse testimony of the witness given during cross–examination.

3. We held in *Quattrocchi* that the trial justice did not abuse his discretion in admitting the statements because the interests of justice appeared to require their admission. *State v. Quattrocchi*, 103 R.I. 115, 125, 235 A.2d 99, 105 (1967).

4. On appeal, defendant contends that a portion of the prejudice allegedly suffered resulted

■ The defendant's contentions that the admission of Guitard's police statement was improper under the rules of evidence governing "present recollection refreshed" and "past recollection recorded" are without merit. Those rules simply are not applicable when a prior, inconsistent statement has been introduced to neutralize adverse testimony.

■ The defendant also contends that the trial justice abused his discretion in failing, *sua sponte* at the time of impeachment, to give a limiting instruction to the effect that the prior, inconsistent statement could be considered by the jury not for its substantive content but only for evaluating the witness's credibility. The trial justice is obliged to give such a limiting instruction, but the timing of the instruction is left to his or her discretion and may be given either at the time of the admission of the statement or in the jury charge. *See State v. Quattrocchi*, 103 R.I. at 123–24, 235 A.2d at 104. In this case, during his charge the trial justice properly instructed the jury with regard to the limited use of the statement. The defendant's counsel failed to request an immediate limiting instruction, and he did not object to the substance of the charge as given.[4] We therefore find that defendant was not prejudiced by the admission of the statement.

## II

The defendant contends that his Fourteenth Amendment right to due process was violated when the trial justice admitted the witness Guitard's prior police statement for impeachment without first conducting an inquiry into its voluntariness. The defendant argues that his inability to test the voluntariness of the statement, when there was a question whether the statement was

from the prosecutor's closing statement and from the trial justice's instruction on the limited use of the prior, inconsistent statement. At trial, defendant failed to object either to the closing statement or to the instruction; therefore, any issues relating to either are not properly before us.

in fact voluntarily given, was a denial of a fair trial. The trial justice refused to allow defendant to inquire into the voluntariness of the statement on the grounds that the Fifth Amendment privilege may only be asserted by the person who made the statement and that voluntariness was not relevant to the use of the statement as impeaching material and could be dealt with on cross–examination.

The defendant urges us to adopt the holding of the United States Court of Appeals for the First Circuit in *LaFrance v. Bohlinger*, 499 F.2d 29 (1st Cir.), *cert. denied*, 419 U.S. 1080, 95 S.Ct. 669, 42 L.Ed.2d 674 (1974). In *LaFrance*, the court held that a defendant's lack of standing to assert another's Fifth Amendment privilege is not a barrier to challenge of the voluntariness of a witness's prior statement to the police when introduced to impeach the witness's testimony. The First Circuit Court's rationale was that the defendant was complaining not of the denial of the witness's constitutional rights but of the denial of his own due–process right to a fair trial occasioned by the use of coerced testimony. *LaFrance v. Bohlinger*, 499 F.2d at 35.

The court stated that although there is "no absolute parallel between the exclusionary rule relative to confessions and that relative to impeaching statements of witnesses, there is a point at which the same considerations apply to both. That point has been reached here because there is a substantial claim by the defendant that the impeaching statement * * * was obtained by police threats and other blatant forms of physical and mental duress. Where such a claim is made, and supported by sworn testimony, the court has a duty to conduct its own inquiry and to exclude the statement if found to have been unconstitutionally coerced." *Id.* at 35.

The United States Supreme Court has held that in a criminal trial any use against a defendant of his own involuntary statement is a denial of due process of law, and such use will be prevented by exclusion of the evidence after judicial resolution of the question of voluntariness. *Mincey v. Arizo-*na, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). The Court has not yet addressed the question posed in *LaFrance*. The defendant contends that the rationale of *Mincey* supports the First Circuit's holding that use of a witness's coerced statement against a defendant also violates the defendant's due–process rights. We believe, however, that witness statements and defendant confessions differ significantly and that the same considerations do not necessarily apply to both. *See People v. Portelli*, 15 N.Y.2d 235, 205 N.E.2d 857, 257 N.Y.S.2d 931 (1965).

First, in this jurisdiction a witness's statement used to impeach may only be considered as it bears on the witness's credibility. The jury may not consider the substantive content of the statement as probative evidence. Second, the testifying witness may be examined by counsel in regard to the circumstances surrounding the giving of the statement, and the jury is free to give possibly coerced statements less weight than voluntary statements. Finally, in order to challenge an alleged violation of constitutional rights and to have the fruits of the violation excluded by the trial court in the first instance, the individual alleging the deprivation must be the one whose rights have been violated by the unlawful governmental conduct, not a defendant claiming to be aggrieved by introduction of damaging evidence. *See Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966–67, 22 L.Ed.2d 176, 187 (1969).

Although we certainly do not condone or approve of unlawful police conduct and agree that "[t]he abhorrence of society to the use of involuntary [statements] * * turns on the deep-rooted feeling that the police must obey the law while enforcing the law;" *Spano v. New York*, 360 U.S. 315, 320, 79 S.Ct. 1202, 1205–06, 3 L.Ed.2d 1265–1270 (1959), we believe that the different considerations surrounding impeaching statements and defendant confessions do not mandate a separate judicial inquiry into the voluntariness of a witness's prior, inconsistent statement. We, therefore, conclude that defendant's constitutional rights were

not violated by the admission of the statement without a prior hearing.

## III

At the close of the evidence the trial justice instructed the jury on first–degree murder, second–degree murder, and manslaughter. The defendant argues that the trial justice's failure to instruct the jury on the elements of involuntary manslaughter in this case, a case in which defendant claims the evidence called for such an instruction, violated his constitutional right to a fair trial.[5]

We follow the common–law definition of manslaughter. *State v. Fenik*, 45 R.I. 309, 121 A. 218 (1923). At common law, manslaughter is classified as either voluntary or involuntary. Voluntary manslaughter is a separate offense that is defined as an intentional homicide without malice aforethought in the heat of passion as a result of adequate provocation. *State v. Goff*, 107 R.I. 331, 337, 267 A.2d 686, 689 (1970); 2 Wharton's *Criminal Law* § 152 at 235 (14th ed. 1979). Involuntary manslaughter, on the other hand, is an unintentional homicide without malice aforethought, committed either in the performance of an unlawful act not amounting to a felony or in the performance of a lawful act with criminal negligence. *State v. McVay*, 47 R.I. 292, 295–96, 132 A. 436, 437–38 (1926); 2 Wharton's *Criminal Law* § 152 at 235.

We need not examine the evidence to determine whether an instruction on involuntary manslaughter was called for. The record shows that at the close of the charge to the jury, defendant not only failed to object to any inclusion in, or exclusion from, the charge but also indicated to the court that he was satisfied with the charge as given. Rule 30 of the Superior Court Rules of Criminal Procedure requires that a party object to portions of the charge before the jury retires and in such a manner as to inform the trial justice of the specific nature of an alleged error. *See State v. Amado*, 109 R.I. 53, 58, 280 A.2d 324, 327 (1971). Without an objection pursuant to Rule 30, the instructions given become the law of the case. *State v. DaRocha*, R.I., 397 A.2d 500, 502 (1979); *State v. Card*, 105 R.I. 753, 758, 255 A.2d 727, 731 (1969).

The defendant insists, however, that notwithstanding his failure to comply with Rule 30 and the law as stated, the trial justice had a duty under G.L. 1956 (1969 Reenactment) § 8–2–38 to instruct the jury on the law of manslaughter. Section 8–2–38 states in part: "In every case, civil and criminal, tried in the Superior Court with a jury, the justice presiding shall instruct the jury in the law relating to the same * *."

We do not dispute that § 8–2–38 mandates that a jury be instructed with respect to those rules of law that of necessity must be applied to the issues raised at trial in order for the parties to secure a fair trial. *State v. Butler*, 107 R.I. 489, 490, 268 A.2d 433, 434 (1970). Nor do we dispute that if certain evidence raises issues of fact favorable to the defendant, "the court should present the issue by an affirmative instruction which fully and fairly declares the law applicable thereto." *Id.* at 491, 268 A.2d at 434. Although failure to request a specific instruction does not excuse the trial justice from his general obligation,[6] on ap-

---

5. In his instructions to the jury, the trial justice defined the crime of manslaughter as follows: "If there is an unlawful killing of a human being without malice aforethought, that crime is the crime of manslaughter. Manslaughter is not a degree of murder, but is a separate offense * * * so that in the circumstances of this case * * * you may consider the crime of manslaughter." The trial justice further instructed the jury that in regard to the crime of manslaughter, "it should be considered whether the crime was committed under the influ-

ence of sudden passion produced by adequate provocation, which would reduce the crime to manslaughter * * *." The trial justice, however, made no reference to involuntary manslaughter.

6. Rule 30 of Super. R. Crim. P. provides in part: "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the request." The defendant made

peal a defendant may not challenge the trial justice's failure to so instruct the jury unless at trial he objected to the charge as given. *State v. Milazzo*, 116 R.I. 443, 447–48, 358 A.2d 35, 37 (1976); *cf. State v. Hoyle*, R.I., 404 A.2d 69 (1979) (failure to object to adequacy of cautionary instructions bars challenge on appeal). We conclude that the defendant has failed to preserve for our review his challenge to the trial justice's charge to the jury.[7]

The defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.

WEISBERGER, J., did not participate.

a request for an instruction that manslaughter is involuntary if performed as a result of voluntary intoxication such that defendant was unable to formulate a specific intent to kill or harbor malice. The trial justice did not give this instruction, nor did defendant object to its exclusion from the charge.

7. The defendant's failure to object to the charge as given might not have precluded our review if the alleged error had deprived him of a basic constitutional right, if defendant did not deliberately bypass the claim, and if the error complained of constituted something more than harmless error. *State v. McGehearty*, R.I., 394 A.2d 1348, 1352 (1978). In scrutinizing the record of the case before us, we do not believe that the trial justice's failure to instruct the jury on the law of involuntary manslaughter infringed a basic constitutional right. *State v. Pope*, R.I., 414 A.2d 781 (1980).