In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 07-1243

STANLEY A. SAMUEL,

*Petitioner-Appellant*,

*v.*

MATTHEW J. FRANK,

*Respondent-Appellee*.

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
03-C-1279—**Lynn Adelman**, *Judge*.

———————

ARGUED SEPTEMBER 5, 2007—DECIDED MAY 12, 2008

———————

Before POSNER, RIPPLE, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. Stanley Samuel was convicted by a jury in a Wisconsin state court of second-degree sexual assault of a child, interference with child custody, and abduction, Wis. Stat. §§ 948.02(2), 948.31(2), 948.30, and was sentenced to 38 years in prison to be followed by 16 years on probation. After exhausting his state remedies, see *State v. Samuel*, 643 N.W.2d 423 (Wis. 2002), he petitioned for federal habeas corpus relief, lost, and appeals.

In 1996, the defendant, who was 47 years old, ran off with a 15-year-old girl named Tisha. Their spree began in

Wisconsin, but they soon left the state and were not picked up until 13 months later, in Missouri, by which time Tisha was nine months pregnant. An issue critical to the charge of sexual assault was whether the pair had had sex in Wisconsin before they left the state (for otherwise the defendant would not have violated Wisconsin's sexual-assault statute). While Tisha denied this at the trial, statements that she had made under police questioning when the couple were returned to Wisconsin after the spree, admitting that she and the defendant had had sex in Wisconsin, were introduced over objection at his trial.

The defendant claims that Tisha's statements had been coerced and therefore that their use in evidence against him violated his federal constitutional rights. The district court disagreed, ruling that the state courts' adjudication of his claims had not been "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). And so it denied relief.

Tisha had given birth the day after her return to Wisconsin. Two days later social workers and officers of the Wisconsin juvenile court convened a conference to decide about the custody of the baby. Police officers attended the conference along with Tisha, her lawyer, her father, and her father's girlfriend. Tisha was questioned extensively. At the end of the conference it was decided to place the infant in foster care temporarily and to hold another placement conference in two days. Tisha was permitted to spend time with and breast feed the baby in the foster home.

On the day between the two conferences, she was interviewed at the police station by two officers and it was then that she gave the statements introduced at trial. The day after the second conference she was given custody of the baby.

At a pretrial suppression hearing, Tisha testified that at the first conference she had been told that if she didn't cooperate she wouldn't get her baby back, and that she understood this to mean that she had to give statements to the police. Her father testified that at that conference the police officers had gotten angry with Tisha because she refused to tell them where she'd been with the defendant or give them the addresses of the people they had stayed with. Her lawyer testified that the impression created at the conference was that unless Tisha gave a full statement concerning the defendant's conduct, she would not get the baby back.

The question whether the statements had been coerced resurfaced at the defendant's trial. Tisha's father testified that when the child welfare officers gave his daughter custody of the baby they said it was because she'd exhibited proper maternal behavior during her visits to the baby at the foster home. The police officers who had questioned her denied any involvement in the initial decision to place the baby in foster care.

We can assume without having to decide that had Tisha been a defendant her statements could not have been admitted against her. The officers may have created the impression that unless she cooperated in their investigation of the defendant they would make sure she did not get her baby back. A failure to cooperate with police *could* be a proper reason for doubting a runaway teenage single mother's competence to be given custody of her

child, and there was more: Tisha had not sought prenatal care or given other signs of taking the responsibilities of motherhood seriously. Had the child-welfare authorities believed that her failure to answer questions about her pregnancy during her months on the run counted against giving her custody of her baby, they could tell her that, even though by telling her they would be forcing her to choose between losing the baby and incriminating the father. She would need that information— information about the consequences of refusing to cooperate—in order to make an informed decision about whether to cooperate.

That would be a different conversation from police threatening her with denial of custody of the baby because she refused to incriminate the father. An incriminating statement induced by that kind of police threat would be inadmissible, at least if sought to be placed in evidence at the trial of the person who had made the statement and been incriminated by it. *Lynumn v. Illinois*, 372 U.S. 528, 534-35 (1963); *United States v. Tingle*, 658 F.2d 1332, 1336-37 (9th Cir. 1981); cf. *Vaughn v. Ruoff*, 253 F.3d 1124, 1128-29 (7th Cir. 2001). It would be like threatening a person with torture if he refused to 'fess up. The problem (or one problem) with allowing such threats is that, to be credible, they would sometimes have to be carried out, and torture and taking away a person's child are not considered proper methods of obtaining evidence against criminals.

Some courts hold that placing in evidence a coerced statement of a witness in a criminal case who is *not* a defendant or a potential defendant nevertheless violates a constitutional right of the defendant, though obviously not his right not to be forced to incriminate himself. E.g.,

*United States v. Gonzales*, 164 F.3d 1285, 1289 n. 1 (10th Cir. 1999); *LaFrance v. Bohlinger*, 499 F.2d 29, 35-36 (1st Cir. 1974). Other courts, including Wisconsin, exclude such a statement only if it is unreliable, which requires that a higher level of coercion be shown. E.g., *State v. Samuel*, *supra*, 643 N.W.2d at 431-32; *United States v. Merkt*, 764 F.2d 266, 273-75 (5th Cir. 1985). Still other courts, including ours, *Buckley v. Fitzsimmons*, 20 F.3d 789, 794-95 (7th Cir. 1994), do not think that there is an exclusionary rule, as such, applicable to third-party statements, though they would reverse a conviction if it rested entirely on a coerced statement that was completely unreliable, just as they would reverse any conviction that rested entirely on completely unreliable evidence. *State v. Vargas*, 420 A.2d 809, 814 (R.I. 1980); *People v. Badgett*, 895 P.2d 877, 883-88 (Cal. 1995). For in such a case no reasonable judge or jury could find that the defendant's guilt had been proved beyond a reasonable doubt, and hence the conviction would have deprived him of liberty without due process of law. *Jackson v. Virginia*, 443 U.S. 307, 317-18 (1979).

The Supreme Court has not decided whether the admission of a coerced third-party statement is unconstitutional, and this may seem to doom the petitioner's case. But section 2254(d)(1) does not say that there can be no relief unless the state court's decision was contrary to a clearly established holding of the Supreme Court. The decision need only be contrary to federal *law* as clearly established by the Court. "Law" is not limited to the narrowest rule stated in a case that is consistent with the facts of the case, which is one sense of "holding"; it embraces legal principles, *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003); *Anderson v. Cowan*, 227 F.3d 893, 896 (7th Cir. 2000), though they

must be legal principles derived from the holdings in Supreme Court opinions. *Carey v. Musladin*, 127 S. Ct. 649, 653 (2006).

Sadly, legal principles often come in nested form, like a series of Russian dolls. It is a legal principle that a defendant is not to be deprived of his liberty without due process of law, but it is also a legal principle that due process of law is violated by admitting the defendant's coerced confession into evidence at a criminal trial. At the level of generality of our first example, Congress's effort in section 2254(d)(1) to prevent federal courts from using their habeas corpus jurisdiction, in cases brought by state prisoners, to venture beyond the limits of clearly established federal law as determined by the Supreme Court would be thwarted. But we have also been told that a state court opens itself to challenge in a habeas corpus proceeding if it "unreasonably refuses to extend [a clearly established] principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 367, 407 (2000); *Malinowski v. Smith*, 509 F.3d 328, 335 (7th Cir. 2007).

This formula would be clearer if the Court had said "apply" rather than "extend," for then it would be clear that the Court was merely making our earlier point that "clearly established Federal law, as determined by the Supreme Court," is not limited to the holding of a case. A principle sweeps more broadly than a holding, but to extend a principle sounds like creating new law. But this is to be too fussy about words; the Court itself has used "application" and "extension" interchangeably in the present context. *Williams v. Taylor*, *supra*, 529 U.S. at 407-08.

There is, however, no rule or principle that evidence obtained by improper means may not be used in a legal proceeding. It has often seemed better to let the evidence in but punish the officer who used those means to obtain it, an increasingly feasible option of the having-your-cake-and-eating-it type now that there are effective tort remedies, especially federal tort remedies, against official misconduct. The emergence of those remedies may be one of the reasons that exclusionary rules have fallen out of favor—as they have; we find today's Supreme Court saying that "suppression of evidence . . . has always been our last resort, not our first impulse," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006), and refusing to extend the existing exclusionary rules. See, e.g., *Pennsylvania Board of Probation & Parole v. Scott*, 524 U.S. 357, 362-65 (1998); *Colorado v. Connelly*, 479 U.S. 157, 166-67 (1986).

Tort remedies are fully effective when the victim of coercion is a witness who is not himself (in this case herself) a defendant, or a criminal of any type. A criminal is not a very appealing tort plaintiff, but Tisha is not a criminal. She is not accused of being the defendant's accomplice rather than his victim. She was only 15 when she ran away with him, and he was 32 years her senior.

Historically, moreover, the concern with coerced statements is a concern with confessions or other self-incriminating statements, e.g., *Doe v. United States*, 487 U.S. 201, 211-14 (1988), rather than with the coercion itself. That is why the rule excluding coerced confessions has been ascribed to the self-incrimination clause of the Fifth Amendment rather than to some broader constitutional right against coercion, on which the defendant in this case, not being the author of the allegedly coerced statements, must rely.

Still another reason to distinguish a witness's coerced testimony from a defendant's is that confessions tend to be devastating evidence in a jury trial because jurors find it difficult to imagine someone confessing to a crime if he is not guilty, unless the pressures exerted on him to confess were overwhelming. Tisha was not incriminating herself when she incriminated the defendant, so there was no reason for the jury to give her statements more weight than they merited.

The fact that the case for exclusion is so much weaker in the present case than in the case of a defendant's coerced confession is a further clue that exclusion would require the creation of new law rather than the application of an existing principle. Against all this the defendant contends that the root objection to coerced evidence is that it is unreliable, and it is unreliable whether it is a witness's evidence or a defendant's. Not all evidence routinely allowed in trials is particularly reliable, however, even eyewitness evidence (see, e.g., Christian A. Meissner & John C. Brigham, "Thirty Years of Investigating the Own-Race Bias in Memory for Faces: A Meta-Analytic Review," 7 *Psychology, Pub. Pol'y & L.* 3 (2001), and references in *United States v. Williams*, No. 06-3260, 2008 WL 17011843, at *2 (7th Cir. Apr. 14, 2008), though the naïve consider it the gold standard of evidence. Moreover, the reliability of a single item of evidence often depends on other evidence, rather than being assessable in isolation. This is true of coerced statements. Not all are unreliable; their reliability may be established by corroboration, as when a coerced statement reveals a fact, say the location of the murder victim's body, *Colorado v. Connelly*, *supra*, 479 U.S. at 160-63; *Brewer v. Williams*, 430 U.S. 387 (1977); see also *New York v. Quarles*, 467 U.S. 649 (1984);

*Orozco v. Texas*, 394 U.S. 324, 324-27 (1969), that only the murderer could have known. It is not a surprise when, forced to speak, a person speaks the truth. Tisha's statements that implicated the defendant were corroborated by other witnesses (who testified to admissions she had made to them concerning her sexual activities with him), were plausible, and, given her continued loyalty to the defendant, perhaps unlikely to have been made, even under the pressure exerted on her, had they been false.

Whether the Wisconsin Supreme Court was right or wrong to refuse to extend the bar against the use of a defendant's coerced statement to that of a nondefendant witness, the court was not unreasonable in refusing to do so; and reasonableness is the test.

That court did not, however, hold that such a statement is *always* admissible—a ruling that would be an unreasonable application of settled law if, for example, because the conviction had been based wholly on unreliable third-party evidence, no reasonable jury or judge could have voted for such a conviction. *Jackson v. Virginia*, *supra*. The court held only that "the standards are different and that when a defendant seeks to suppress an allegedly involuntary witness statement, the coercive police misconduct at issue must be egregious such that it produces statements that are unreliable as a matter of law." 643 N.W.2d at 426. So if the court was unreasonable in determining that the facts did not establish such "egregious" police misconduct, the petitioner is entitled to relief under 28 U.S.C. § 2254(d)(2) (state court's decision "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding"), as in *Miller-El v. Dretke*, 545 U.S. 231, 264-66

(2005), or *Taylor v. Maddox*, 366 F.3d 992, 999-1001 (9th Cir. 2004).

The authorities responsible for the welfare of Tisha's baby had a legitimate concern with her failure to cooperate with the criminal investigation of the defendant. They were entitled to express that concern to her, so that she could make an informed decision whether to cooperate, knowing that her failure to do so would be weighed in the balance that would determine whether she would obtain custody of the child. Inevitably that concern and the expression of it nudged her toward cooperation and hence to making the statements that incriminated the defendant. The threat of losing her baby was in the background, but it emanated primarily from the circumstances of Tisha's weeks on the run while pregnant, rather than from police misconduct. Or so the state courts could conclude without being thought unreasonable. Cf. *Johnson v. Trigg*, 28 F.3d 639 (7th Cir. 1994).

AFFIRMED.

ROVNER, *Circuit Judge,* concurring. Before I turn to my point of dissension, I must begin with the many ways in which I am in almost complete agreement with the majority. The majority concludes that the state court of Wisconsin need not treat coerced statements of non-defendant witnesses the same way as coerced statements of defendants. Although the latter must be suppressed, the former need not. With this premise I agree. I also agree

with the majority's reasoning as to why this is so. As the majority correctly concludes, coerced statements by non-defendant witnesses do not implicate a defendant's Fifth Amendment right against self-incrimination. The only threat they pose to due process stems from their inherent unreliability. If, for example, (again, as the majority points out) a conviction rests entirely on a coerced witness statement that is unreliable, such a conviction would deprive a defendant of due process of law, "[f]or in such a case no reasonable judge or jury could find that the defendant's guilt had been proved beyond a reasonable doubt." Ante at 5 (citations omitted). If the state court gains evidence from a non-defendant witness in a manner that violates her rights, the majority states, and I concur, that the remedy is not to suppress that evidence, but for the aggrieved witness to be made whole (to the extent the law is capable) by filing a civil claim against the wrongdoers. Thus far I have merely recited what the majority has said, far more eloquently than I. Nevertheless, in order to understand where we differ, I must begin with where we agree.

In short, both the majority and I agree that our concern, as a federal court reviewing a petition for habeas corpus, is with due process rights of the defendant. More specifically, where a defendant complains about the admission of a coerced statement from someone other than himself, our focus must be on the reliability of that statement and the state court's assessment of that reliability. *See* 28 U.S.C. § 2254(d)(1). Any state rules or standards that the state court may have applied in evaluating the admissibility of the statement are irrelevant to our analysis. *Kubat v. Thieret*, 867 F.2d 351, 358 (7th Cir. 1989) ("[o]n habeas review our role is not to mandate optimal

procedures to the state courts. Rather, our role is to pro-tect against constitutional error.”). Our concern is with the bottom line—the reliability of the witness’ state-ment—and whether that bottom line reflects a reason-able application of United States Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).

   The first (and, as I will argue shortly, the only) deter-mination we must make, therefore, is whether Tisha’s coerced statement was so unreliable as to deprive Stanley Samuel due process of law. There were plenty of reasons one could think that Tisha’s statement was unreliable. The most obvious of which is that a mother threatened with the loss of her newborn infant is likely to say any-thing to keep her child. And there are others as well. The majority opinion makes short shrift of some of the more unseemly facts surrounding Tisha’s statement, but those facts are as follows: forty hours after having given birth, (and about three days after being reunited with her father after thirteen months on the run with a forty-seven-year-old pedophile) sixteen-year-old Tisha was summoned to a meeting at the office of the corporation counsel to determine whether she could keep her baby in her custody. At that meeting Tisha was surrounded by eight adults—a police officer, several attorneys, many members of the Wisconsin Department of Health and Family Services or the county equivalents (together, “social services”) and her parents. She was exhausted from a difficult delivery, she was medicated, she was frightened and undoubtedly disoriented from her re-entry into her community after thirteen months on the run with a criminal. Tisha testified that she was told that she would have to co-operate and tell the police officers about her sexual activity with Samuel if she wanted to

keep her baby. (9-18-97 Tr. at 13, 15, 18, 27-28, 31-32) (12-2-97 Tr. at 159-162) (12-3-97 Tr. at 202-206, 209). Her father, Peter, testified that he was given the same impression and that social workers specifically told him the types of information that Tisha needed to provide. (9-18-87 Tr. at 37-39, 40-41, 43) (12-1-97 Tr. at 195-97) (12-3-97 Tr. at 144-147). Significantly, Tisha's attorney also testified that it was his impression that Tisha had to give a statement to the investigating police officer before she could get her baby back. (9-18-97 Tr. at 47). Even the state's main witness, social worker Rodney Schraufnagel, testified that during the hearing and conference to determine where the baby would go, Tisha was told numerous times that in order to make a determination about the baby's placement, the social workers would "need her cooperation," including disclosing information about what she had done during her time with Samuel. (12-3-97 Tr. at 76-77, 111, 115-116). Officer Sagmeister, the police officer in charge of the investigation into Samuel's illegal behavior, agreed that at the hearing to determine the baby's placement, Tisha had been told that she would have to cooperate. (12-3-97 Tr. at 55). When Tisha refused to cooperate and turn in the father of her child, her baby was taken away. Then, less than twenty-four hours after yielding to the state's pressure and telling the police exactly what they needed to prosecute Samuel, the baby was back in her arms.

Despite these unseemly facts, the state presented an overwhelming amount of corroborating evidence that supported the version of events that Tisha reported in her post-partum meetings with social services and the police thus demonstrating the reliability of the statements. In any event, the jury was free to weigh the evi-

dence of unreliability of the statement (there was plenty of it, as described above, and the defense had ample opportunity to put all of it into evidence) against the weight of the other evidence. In short, we cannot conclude that Tisha's coerced statement was so inherently unreliable as to deny Samuel due process.

I part company with the majority when the opinion comments on the legitimacy of the state's actions in removing Tisha's baby from her physical custody. My colleagues opine that the state court could reasonably conclude that the Wisconsin state authorities had a legitimate concern for the welfare of the infant—a concern fueled, primarily, by Tisha's failure to cooperate with the criminal investigation of Samuel. The majority enters this arena, ostensibly, in its effort to determine whether the state court decision was based on an unreasonable determination of the facts in the light of the evidence presented in the state court proceedings. Ante at 9; *see also* 28 U.S.C. 2254(d)(2). In Samuel's state court proceedings, the Wisconsin Supreme Court concluded that in order to suppress an alleged involuntary statement by a non-defendant witness, "the coercive police misconduct at issue must be egregious such that it produces statements that are unreliable as a matter of law." *State v. Samuel*, 643 N.W.2d 423, 426 (Wis. 2002). The majority then proceeds to determine whether the state court reasonably could have found the facts surrounding Tisha's statement to be "not egregious."

Wisconsin may require that the coercion be so egregious as to be unreliable, but in this way Wisconsin has engrafted an extraneous factor onto the due process analysis. As both the majority and I have explained, the only inquiry we must make for federal due process pur-

poses is whether the statement was so unreliable as to deprive Samuel due process of law. The egregiousness of the coercion of the non-defendant witness (although worthy of our comment as human beings), is of no moment to a federal court reviewing the criminal defendant's due process claim. In cases where the Wisconsin court thinks that the state actors behaved egregiously, it might exclude a statement based on that egregiousness when that statement is in fact reliable. Conversely, it might allow the admission of statements that are not the product of egregious coercion but that are nonetheless completely unreliable. Because egregiousness is an extraneous factor not necessarily determinative of reliability, it is beyond our power to review. "Errors of state law in and of themselves are not cognizable on habeas review. The remedial power of a federal habeas court is limited to violations of the petitioner's federal rights, so only if a state court's errors have deprived the petitioner of a right under federal law can the federal court intervene." *Perruquet v. Briley*, 390 F.3d 505, 511-12 (7th Cir. 2004) (internal citations omitted). The touchstone of due process, for our purposes, is the reliability of Tisha's statement rather than the egregiousness of the state's actions. Consequently, the state's actions, even if egregious, did not deprive Samuel of due process.

For these reasons, the majority's exploration into the legitimacy of the infant's removal is unnecessary to our limited review. Nonetheless, because I think reasonable minds could differ, and because I am concerned that we not place our imprimatur of approval on the state's actions, particularly when unnecessary, I am compelled to follow the piper into the river.

When the state removes a child from the custody of its parents, it is trampling on one of the most fundamental

and personal rights—the right to parent a child. It is a drastic measure and made even more so when the state removes a baby just days after birth, when mother-infant bonds are forming, when milk production begins, and when women are adjusting to a number of physical and emotional changes and demands of motherhood. A state may not turn to such a drastic remedy—even in compelling circumstances—unless there is no other more narrow method of protecting a child. Indeed, the State of Wisconsin reflects this constitutional requirement in its legislation which states that it will remove a child from the custody of a parent "only where there is no less drastic alternative." Wis. Stat. § 48.355(1).[1]

The majority opinion indicates that the state authorities had a legitimate concern with the baby's welfare due to Tisha's failure to cooperate with the criminal investigation and her weeks on the run while pregnant. Indeed, the principal social worker involved in the case indicated that the primary reason for removing Tisha's daughter was that social services workers feared that Tisha would abscond with the baby and seek refuge with the same persons who had aided Samuel during their thirteen months on the run. Removing Tisha's baby seems to be far from the "least drastic" measure possible, however. Tisha's father and live-in girlfriend had custody of Tisha and indicated their willingness to monitor Tisha and the

---

[1] Although this language comes from a statute describing the considerations of judges in more complete fact-finding hearings—as opposed to the more preliminary kind to which it appears Tisha was subjected—due process requires a state to have a narrowly tailored solution to any intrusion on the right to parent.

baby closely, but there is no testimony in the record as to why their competence was doubted. *See e.g.* Wis. Stat. § 48.355(1) ("If there is no less drastic alternative for a child than transferring custody from the parent, the judge shall consider transferring custody to a relative whenever possible."). Tisha and her child could have been held together in a secure facility—perhaps in the medical unit of a youth facility or in another facility where female youth offenders who have just given birth are held. Even adult criminal offenders in Wisconsin are eligible to maintain physical custody of their very young children in the Mother-Young child care program. Wis. Stat. § 301.049. There are, of course, other possibilities, and surely social services was familiar with many of them in light of its obligation to preserve the family units whenever possible in conformity with the legislative purpose of the Children's Code governing the Department of Health and Family Services. *See e.g.* Wis. Stat. § 48.01(a).

The state had a few other toothless justifications for its concern about the baby's welfare, but these can be quickly dismissed. Any concerns about STDs and HIV could have easily been addressed by testing both Tisha and her baby for STDs and HIV with Tisha's informed consent. (See 12-3-97 Tr. at 77). (In fact, since the CDC recommends that all pregnant women receive an HIV test and that those who have had no prenatal care be encouraged to have a rapid HIV test when arriving at the hospital, it is likely that Tisha was indeed tested. *See* http://www.cdc.gov/ mmwR/preview/mmwrhtml/rr5514a1.htm.) The state also expressed some concern over Tisha's lack of prenatal care, but this is hardly a reason to take the drastic step of removing a child from parental custody. In 1996 alone, 2,146 women in the state of Wisconsin gave birth to

babies who had received late or no prenatal care (3.2% of all births statewide). *See* http://www.dhfs.state.wi.us/ WISH/index.htm. Furthermore, more than twenty-five thousand births in Wisconsin in 1996 (37.5% of all births statewide) were to women between the ages of fifteen and nineteen. *Id.* Surely the state does not conduct hearings to determine the appropriate placement for all babies born to unmarried teenage mothers. Consequently, without much meaningful rationale for questioning Tisha's competency as a mother, it does indeed appear that social services used the baby's placement hearings as pretext to garner information for Samuel's criminal prosecution.

In short, rather than exploring any less drastic alternatives, the state authorities dangled the infant before Tisha. Once Tisha gave the police all the information the state needed to prosecute Samuel, the authorities returned Tisha's baby to her. Civilized governments do not take babies away to coerce a victim's testimony—even in the name of protecting that victim and others.

The dissenting justice on the Wisconsin Supreme Court stated, "[l]ower courts will ask, with some degree of confusion, if these facts do not [constitute egregious police misconduct], what does?" *State v. Samuel*, 643 N.W.2d 423, 436 (Wis. 2002). The majority of that court believed otherwise. This is not, however, our battle to enter. Whether the state's behavior was egregious or not, the use of Tisha's statement did not violate the defendant, Samuel's, due process rights. The injury from the state's behavior was to Tisha and it was Tisha who had the option of seeking a remedy.